**DREW CHEMICAL CORPORATION, a corporation, Complainant,**

**v.**

**STAR CHEMICAL COMPANY, a corporation, W. J. Fenner, John Gugelman and Ronald Beaver, Defendants.**

**No. 1316.**

United States District Court
W. D. Missouri,
St. Joseph Division.

Aug. 1, 1966.

As Corrected Oct. 17, 1966.

William H. Utz, Jr., of Smith, Sherwood, Utz & Litvak, St. Joseph, Mo., for plaintiff.

Robert E. Douglas, of Brown, Douglas & Brown, St. Joseph, Mo., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW.

DUNCAN, Senior District Judge.

Plaintiff, a Delaware corporation, whose principal place of business is in New York City, instituted this suit against the defendants, all of whom are residents of Missouri, seeking to enjoin them from manufacturing, compounding and selling certain formulae to the dairy industry. The amount in controversy exceeds $10,000.00.

It is contended that the formulae in question constitute trade secrets of the plaintiff and that they have been illegally appropriated, manufactured and sold by the defendants. In addition to the injunction against further manufacture and sale of these products by the defendants, the plaintiff also seeks damages for prior injury resulting from defendants' activities.

At the close of all the evidence, the court sustained a Motion to Dismiss as to defendnat, Ronald Beaver.

Plaintiff is engaged in the manufacture and sales of a full line of emulsifiers, stabilizers, and other products used in the dairy industry. The corporate defendant, Star Chemical Company, is also engaged in the manufacture and sale of these products. The individual defendants are two employees and a former employee of Star, i. e., a major officer of the corporation, a principal sales employee, and a former salesman. They all are former employees of the plaintiff corporation.

In addition to the contention that the defendants have illegally appropriated certain trade secrets of plaintiff, it is also alleged that the individual defendants have violated an agreement entered into between them and the plaintiff, during the course of their employment with the plaintiff, whereby they promised, for a valuable consideration, not to use or reveal any knowledge or information gained by them while in the employ of plaintiff, with respect to the composition or manufacture of plaintiff's products.

Plaintiff contends that the illegal appropriation of its trade secrets as well as the breach of the foregoing contract resulted from the conspiratorial organization of the defendant corporation and the revelation to it by the individual defendants of plaintiff's trade secrets concerning the manufacture and sale of its products.

The agreement entered into between the plaintiff and the individual defendants is dated February 1, 1963. Those who signed it, including defendants Fenner and Gugelman, who were then in the employ of plaintiff, agreed, among other things, that unless authorized by Drew, they would not, during or within two years after the termination of their employment with Drew, disclose to others or use any of the corporation's inventions or discoveries or its secret or confidential information, knowledge or data, which they might obtain during the course of their employment, relating to formulae, business methods, processes, machines, manufactures, or compositions, whether or not developed by the signers of the agreement. This agreement was to be effective for two years after the termination of their employment with Drew. Fenner's employment terminated in August, 1964, and Gugelman's in September of the same year.

In light of the foregoing expiration date provided for in these contracts, together with the actual date of Fenner and Gugelman's termination of employment with Drew, as related, it is clear that these agreements, even if valid, would have expired as to these defendants, in August and September, 1965, respectively, and are not now in effect. In light of this determination, it is apparent that neither the validity of the agreement nor its legal effect can be determinative of this lawsuit, at least in regard to its injunction aspects and we therefore find it unnecessary to presently consider these issues.

However, it is clear and the defendants admit that they will be legally liable to plaintiff and an injunction against further violations should issue if it is de-

termined that they, in fact, illegally appropriated plaintiff's trade secrets, to the same extent as if they had breached the contract in question. Hence, the determination of plaintiff's allegations, in this regard, will lead to the same resolution of the issues between these parties as if the agreement between them were still in effect. Therefore, it is to these questions that we now turn.

Prior to 1963, all of the individual defendants had been in the employ of the Drew Chemical Company for many years. Fenner had been employed in various capacities, including administrative vice-president in charge of sales and various divisions, including the dairy division. It is admitted that during this period of time, he had acquired a complete knowledge of the various formulae which had been blended, compounded, manufactured and sold by the plaintiff, for the various purposes for which they were suited in the dairy industry.

Defendant Gugelman, in 1963, was District Sales Manager of the Western District in Los Angeles. Previously, he had been division manager of the dairy division. In this position, it is clear that he, like Fenner, but to a lesser degree, had access to confidential files and was generally familiar with the various formulae involved in Drew's products, as well as the methods of their manufacture.

Gugelman also, of course, had knowledge of his sales territory and the customers therein to whom plaintiff sold its products. Defendant Ron Beaver had been employed as a salesman for the plaintiff in the Springfield, Missouri, area. The only files and information to which he had access were his personal customer contact files.

Shortly after the signing of the agreement between Fenner and plaintiff, there apparently arose a controversy between them which led to the severance of Fenner's connection with the corporation. In anticipation of this occurrence, it is undisputed that he and Gugelman, together with a man named Clay, and another, met in Kansas City to discuss the possibility of organizing a company for the manufacture of a full line of dairy products such as that manufactured by the plaintiff, to be sold in the industry in competition with plaintiff's products and other similar products.

There was no evidence adduced at the trial that defendant Beaver was present at the Kansas City meeting. In fact, the evidence reveals that he was not hired by the defendant corporation until approximately two months after its formation.

It is plaintiff's contention that, at this meeting, there was a conspiracy entered into for the purpose of appropriating the formulae used by the plaintiff and revealing these formulae to the corporation to be organized by them for the manufacture and sale thereof in competition with the plaintiff.

In addition, it is alleged that the individual defendants, or some of them, removed letters and other confidential matters from the files of the plaintiff which were in Fenner's custody, for the purpose of obtaining the names of plaintiff's customers to whom they intended to sell their new products, and also to pirate from plaintiff the formulae used in the manufacture of these products.

The specific formulae which the plaintiff alleges the individual defendants conspired to manufacture at the Kansas City meeting, and which, allegedly, they subsequently did manufacture and sell, have been limited to the following, by stipulation of counsel:

(1) Gold Star Mulse No. 1, an ice cream stabilizer and emulsifier, which, it is contended, is the same or substantially the same as plaintiff's Flex-a-Freeze and Poly No. 80;

(2) Gold Star No. 3, which, it is contended, is the same or substantially the same as plaintiff's Drew Mulse No. 80;

(3) Gold Star Mulse No. 4, an ice cream stabilizer and emulsifier, which, it is contended, is the same or substantially the same as plaintiff's Econ-o-Beads and Flex-a-Beads No. 30;

(4) Gold Star No. 3, an ice cream stabilizer and emulsifier, which, it is contended, is the same or substantially the same as plaintiff's Flex-a-Flash;

(5) A cream stabilizer;

(6) A milk carrier vitamin;

(7) A combination beaded stabilizer-emulsifier which was used in the Gold Star line of products.

Shortly after the Kansas City meeting, defendants Fenner and Gugelman carried out their plans to organize the defendant Star Chemical Company and opened an office in St. Joseph, Missouri, for the purpose of engaging in the manufacture of the above described products, which were subsequently placed on the market and offered for sale to the dairy industry throughout the country.

In their answer, the individual defendants, Fenner and Gugelman, admit that they met in Kansas City and discussed, generally, the idea of organizing the defendant Star Chemical Company for the manufacture and sale to the dairy industry of products with which they were familiar, and which, they proposed, would generally parallel the products manufactured and sold by the plaintiff. They deny, however, and there is no evidence to the contrary, that they conspired to use the formulae of the plaintiff, or its manufacturing processes, in their products.

There was, likewise, no evidence adduced at the trial to support plaintiff's allegation that any of the defendants took from plaintiff's files any information concerning plaintiff's formulae. Nevertheless, it has been admitted by defendant Fenner that, at the time he left the employ of Drew, he knew, personally, most of the formulae of the products of their dairy division, as well as the manufacturing processes used in their production. Thus, the defendants admittedly possessed other equally proficient means by which they could have utilized the plaintiff's formulae and production methods in their own products.

In this connection, however, Fenner testified that he, as president of Star, determined, upon legal advice, that Star should not duplicate or attempt to duplicate either the formulae or manufacturing processes of Drew, and that Star's products and production methods do, in fact, differ from those of plaintiff.

Thus we arrive at the crux of the lawsuit. The issues to be here resolved are well defined and involve, basically, only questions of fact. They are:

(1) Does the manufacturing process for the combination beaded stabilizer-emulsifier produced by plaintiff constitute a trade secret, and if so, has it been illegally appropriated by defendants, thus entitling the plaintiff to an injunction, at the present time?

(2) Has the plaintiff suffered damages as a result of the prior manufacture of this product by defendants?

(3) Do the formulae of the other above described products of the plaintiff constitute trade secrets, and, if so, have they been illegally appropriated by the defendants, thus entitling the plaintiff to an injunction, at the present time?

(4) Has the plaintiff suffered damages as a result of the prior manufacture of these products by defendants? These questions will be discussed in the order presented.

(1) The combination stabilizer-emulsifier beaded products manufactured by the plaintiff are used as a basic component of their products known in the dairy industry as Flex-a-Beads, Flex-a-Flash, Flex-a-Freeze SS and Econ-o-Beads.

An emulsifier, used alone, produces the whipping ability in the finished ice cream mix, and, also, serves to keep the fat globules properly dispersed, thus imparting ᵤmoothness and texture to the finished ice cream product.

A stabilizer, used alone, gives body and "chewability" to the finished ice cream mix, and also serves to prevent the migration of water during periods of heat shock or periods when the ice cream is thawed above its freezing point causing free water to be released which, without the use of a stabilizer, would later refreeze into large ice crystals.

Stabilizers are also used to prevent the ice cream from becoming coarse through mishandling. They consist principally of vegetable gums, carboxy methyl cellulose (CMC), a cellulose derivative, and Carrageen or Irish Moss. These ingredients are purchased by Drew and then combined by it into their various products, according to their formulae. The emulsifiers thus used in these products are commonly used in many products in the dairy industry, and also are purchased by Drew prior to the formulation of their finished products.

Plaintiff produced two of their employees as witnesses at the trial who testified that the beaded combination stabilizer-emulsifier produced by Drew for use in the above named products is unique, and that the only similar products they knew of were those produced by the Star Chemical Company. They stated that the principal advantage of the beaded combination product over the use of stabilizers and emulsifiers in an uncombined state, which is the common practice in the industry, is the ease with which finely divided particles of stabilizing colloids can be dispersed in an ice cream mix without lumping. This unique dispersability property of the beaded combination enables it to carry into an ice cream product very fine gum particles, which are highly desirable in modern ice cream processing, without the dispersability problems which are usually encountered when these type gums are attempted to be incorporated in a mechanical blend which utilizes a stabilizer and emulsifier which are not in combination.

The combination product allows the gum particles to disperse very readily and break up even in cold water, which, in itself, is said to be unique. They are thus able to be dispersed throughout the ice cream product and accomplish their stabilization and emulsification functions, even in the cold, without the application of heat.

In the usual manufacturing procedure, the stabilizer gums are blended with the waxy emulsifier by mechanically mixing them in the dry state. The unique manner claimed by the plaintiff for producing their beaded combination stabilizer-emulsifier consists of melting the emulsifier and introducing the stabilizer gums into the resultant liquid. The mixture is then spray chilled into a beaded form.

The beaded combination stabilizer-emulsifier products are manufactured by the plaintiff at its Boonton, New Jersey plant, where there is located a special tower for this purpose. The cost of this tower was approximately $250,000.00.

In Drew's manufacturing process, the emulsifiers are pumped from ester kettles, wherein they undergo esterification, to the tower; thence, they are put into a 20,000 pound tank, with rapid agitation, and maintained at a temperature of 150 to 165 degrees Fahrenheit. The stabilizing gums are then introduced, and the rapid agitation continues until a completely homogeneous slurry is produced. The slurry's temperature is maintained at 150 to 165 degrees Fahrenheit. It is next pumped to the top of the stainless steel tower, which is chilled by means of a distributing wheel at the top, causing countercurrent refrigerated air to circulate through it. The hot slurry is distributed by the wheel into the tower and is chilled on the way down into beadlet form.

There can be no doubt that the foregoing manufacturing process used by Drew to produce their beaded combination stabilizer-emulsifier product involves sundry technical problems which demand a highly specialized knowledge, i. e., getting the emulsifier and stabilizer into a slurry and delivering them to the mouth of the spraying apparatus; recovery of the bead; maintaining the uniformity of the solution, both prior to and at the point of atomizing; knowledge of the type of formulations which are adaptable to this type of operation; the particular requirements of the liquid system prior to spraying; spraying in a particular manner in order to achieve the proper result; knowledge of which emulsifiers and gums were adaptable to be used in combination with the stabilizer to make the combination bead.

It is the undisputed evidence in this case that Drew Chemical Corporation spent many years developing and perfecting the above-outlined process for making a combination stabilizer-emulsifier in one sprayed bead. It is also undisputed that this process was Drew's confidential and secret information which was made available only to the officers of its dairy division, including defendants Fenner and Gugelman, laboratory personnel, and, perhaps, cost accountants.

The evidence further demonstrates that detailed information concerning this process was not known by Drew's ordinary salesmen and general employees, nor was it made available to the industry or public at large, in other than a general way. Moreover, the evidence shows that, at least prior to the introduction of a beaded combination stabilizer-emulsifier in their Gold Star line of products by Star, no other such product was offered for sale to the dairy industry by any other company besides Drew.

Notwithstanding the above facts, the evidence shows that when the defendant Star Chemical Company commenced business in November, 1964, it built, used and subsequently destroyed an experimental non-sophisticated spray tower for the purpose of attempting to spray a beaded combination stabilizer-emulsifier product in substantially the same process followed by the plaintiff. Star's tower, unlike Drew's, was very primitive in construction, being a corn-crib affair made out of Plywood and 2 × 4s with a polyethyline liner, and having a food-grate belting running down the bottom to remove the product that was sprayed into it. Dairy sanitary pipe was used for movement of the product, and abandoned dairy pumps were used for the pumping. Also, a nozzle instead of a wheel was used in the chilling process.

The approximate cost of this tower was $600.00, far less than the $250,000.00 which it cost to construct the Drew tower. The primary differences between the two were in the degree of sophistication each employed. Drew's tower had controls; Star's did not. Drew's had jacketed piping; Star's did not. In short, Drew's tower was a full-scale sophisticated production tower, whereas, Star's was a mere experimental tower which utilized a very primitive construction.

Defendant Fenner testified that the defendant's intention at the time of the construction of their tower was to see if they could use it to economically spray bulk emulsifiers which they could buy at advantageous prices. If it was found that this was feasible, he stated that they then planned to expend more capital and construct a more sophisticated production tower.

Star's results in regard to their experimental tower, however, did not prove to be promising, and so they abandoned it, together with their plans to spray a beaded combination stabilizer-emulsifier in the above manner. The evidence shows that this occurred between November, 1964, and January, 1965. Prior to to this abandonment, however, it is clear that Star did produce a beaded combination stabilizer-emulsifier product, for not more than three months, and, during that time, used it in three of its products, Gold Star No. 1, Gold Star No. 3, and Gold Star No. 4. The evidence shows that the percentage of the combination product thus incorporated into these Gold Star products was not more than 20%.

In light of the foregoing testimony, we are of the opinion that the plaintiff's process for manufacturing a beaded combination stabilizer-emulsifier product did, in fact, constitute a trade secret within the meaning set forth by the 8th Circuit Court of Appeals in Sandlin v. Johnson, 141 F.2d 660, 661 (1944) as follows:

"A trade secret may consist of any formula, (process,) pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." (Restatement of Torts, paragraph 757, comment b.)

We reach our conclusion, in this regard, despite the above-related differences be-

tween Star's tower and that of the plaintiff, as well as the other differences between their production processes. We feel the controlling factors compelling this determination to be as follows:

(1) The beaded combination stabilizer-emulsifier product was unique to Drew before Star commenced its manufacture of it;

(2) The product imparted properties to Drew's finished products which gave them a distinct advantage over competitors whose products did not contain it.

(3) The inference is compelling, from the evidence taken as a whole, that this trade secret of the plaintiff was disclosed to the defendant corporation by one or more of the individual defendants, to whom it had been revealed in confidence by Drew, while they were in Drew's employ. All in all, we cannot but feel that the manufacturing processes followed in the production of the two beaded combination stabilizer-emulsifiers in question are basically the same, and, in the circumstances of this case, we must conclude that Star's process and its resultant product were not the result of its own independent research.

■ In light of our above determination, it is clear that the beaded combination stabilizer-emulsifier product produced by Star and incorporated in their finished products denominated Gold Star No. 1, Gold Star No. 3, and Gold Star No. 4, would be subject to the following general rule regarding trade secrets, were there no additional qualifying facts for us to consider:

"The rule in Missouri, as well as generally, is that, though a trade secret is unpatentable, it will nevertheless be protected from use or disclosure by one to whom it has been revealed in confidence." (Restatement of Torts, paragraph 757, and various cases cited by the court.) Sandlin v. Johnson, supra, 661.

In the present instance, however, it is clear that the situation substantially changed between the time of the filing of this case and the time of its trial, thus making the above general rule inapplicable at the present time. At the time the defendant corporation began to manufacture its combination beaded stabilizer-emulsifier, the plaintiff was the only producer and marketer thereof, but since that time, others have entered the field. The evidence reveals that Durkee's Famous Foods, Industrial Division, has manufactured and offered for sale a beaded combination product similar to the one involved here since June or July, 1965, and that the Atlas Company and, perhaps eight others are also now engaged in manufacturing a similar type product by means of manufacturing processes similar to those employed previously by Drew and Star.

■■ Thus, it seems, that although Drew's process of manufacturing the beaded combination stabilizer-emulsifier product did, at one time, constitute a trade secret, protectable by injunction, this process and the resultant product are no longer of this category, having been arrived at by independent research, in many quarters. Therefore, at the present time, as a result of these developments, Star, as well as the rest of the world, is entitled to make use of this process and manufacture the combination product. As stated in Sandlin v. Johnson, supra, at 661:

"The discoverer's property right in a trade secret ceases prospectively to exist * * * once the matter has become public property by a general disclosure on the part of the discoverer, *or by a legitimate discovery and rightful general disclosure on the part of another.*" (Emphasis supplied.) (Cases here cited.)

Hence, it is clear, in the instant case, as in Sandlin v. Johnson, supra, that it is simply too late for injunctive relief to be granted.

(2) It is also our conclusion that the plaintiff has failed to prove that it has suffered damages of any kind, as a result of the defendants' manufacture of the combination beaded stabilizer-emulsifier prior to the time the defendant corporation ceased production of it. The evi-

dence shows that this occurred between November, 1964 and January, 1965. Prior to that time, Star produced the combination product for not more than three months and, used it in three of its products, Gold Star No. 1, Gold Star No. 3, and Gold Star No. 4.

Plaintiff has the burden of proving the amount of damage it has sustained as a result of the defendants' illegal appropriation of its trade secret. It is clear that this burden has not been sustained. In no way has the plaintiff shown that the defendant corporation succeeded in attracting any of the plaintiff's business, to the latter's detriment, by the incorporation of the beaded combination stabilizer-emulsifier into its Gold Star products. We must, therefore, conclude that no measurable damages have been sustained, in this connection, by the plaintiff.

In addition to the foregoing allegations concerning the beaded combination stabilizer-emulsifier, plaintiff also contends that the formulae of certain other of its products likewise constitute trade secrets which have been illegally appropriated by the defendants, thus entitling the plaintiff to an injunction and damages, in regard to these products. This allegation is made in regard to the following other products produced by the plaintiff and defendant corporations:

(1) Gold Star No. 1, an ice cream stabilizer and emulsifier, which, it is contended, is the same or substantially the same as plaintiff's Flex-a-Freeze and Poly No. 80;

(2) Gold Star No. 3, which, it is contended, is the same or substantially the same as plaintiff's Drew Mulse No. 80;

(3) Gold Star Mulse No. 4, an ice cream stabilizer and emulsifier, which, it is contended, is the same or substantially the same as plaintiff's Econ-o-Beads and Flex-a-Beads No. 30;

(4) Gold Star No. 3, which, it is contended, is the same or substantially the same as plaintiff's Flex-a-Flash;

(5) A cream stabilizer;

(6) A milk carrier vitamin.

Regarding, first, plaintiff's allegations concerning defendants' Gold Star products, the evidence clearly demonstrates that these non-concentrated combination stabilizers and emulsifiers, which are used in ice cream and other dairy products, are not unlike many other brand name products which are produced by many other companies engaged in the stabilizer ice cream business.

The plaintiff, of course, has the burden of proving, by a preponderance of the evidence, that the formulae of its products·which it contends constitute trade secrets, are, in fact, unique to Drew in the industry, and, also, that Star's products with which they are in competition, are analogous to theirs.

The plaintiff has failed to sustain its burden in this regard, in that it has failed to produce any evidence of what its formulae are. Since the defendants, on the other hand, have testified as to the composition of their Gold Star products and presented evidence of substantial differences between them and Drew's analogous products, we have no alternative other than accepting the evidence thus adduced by the defendants, as correct.

In this connection, defendant Fenner testified that Gold Star No. 1 has 10% more moss, CMC and guar than the corresponding Drew product, Flex-a-Freeze. Also, Flex-a-Freeze contains one combination emulsifier, whereas, Gold Star No. 1 contains two combination emulsifiers, plus GMS. Fenner testified that still a further distinction was that Star, unlike Drew, uses Tween Moss, which has poly oxethylene 20 sorbitan mon-oleate in it. Finally, Fenner testified that Gold Star No. 1, unlike Flex-a-Freeze, contains calcium sulphate, which acts as a companion stabilizer to the guar, as well as another ingredient, Zeelox.

Fenner further testified that Star's formulae for Gold Star No. 3 consists of 6½% moss, 24% CMC, 13% guar, 41% GMS, 10% Tween Moss 100, 1½% Zeelox, 1½% calcium sulphate, and 2½% Tween 80. The evidence shows that this product is a concentrated ice

cream stabilizer used at low usage levels and is in competition with Drew's product known as Flex-a-Flash. Fenner stated, and there is no evidence to the contrary, that the difference between Flex-a-Flash and Gold Star No. 3 is that the latter product has approximately 7% less moss and 10% more gum than Flex-a-Flash, and also contains calcium sulphate and Zeelox, which are not present in Flex-a-Flash.

In regard to Gold Star No. 4, Fenner testified that it contains 7% moss, Carrageen, 6% CMC, 3½% guar, 2% Tween 80, 38½% GMS, 8% Tween Moss 100, 2% Tween Moss 200, 2% Zeelox, and 3% calcium sulphate. Gold Star No. 4 is in competition with Drew's products Flex-a-Beads and Econ-o-Beads. Fenner stated, and there is no evidence to the contrary, that Gold Star No. 4 has more gums and a less amount of emulsifiers than Drew's corresponding products.

A cream stabilizer is used for stabilizing coffee cream, half and half and whipping cream. Plaintiff's witness, Mr. Meade, testified that Drew's product is a blend of stabilizing gums and a balancing phosphate salt. It is alleged by the plaintiff that their product is unique and therefore constitutes a trade secret because, prior to the time Star's product was introduced, their product was the only one on the market that was comprised of stabilizing gums and the balancing salt. They admit that there are other products on the market which consist of principally balancing salts, and others, which contain gum and sodium chloride as whipping aids. But, they contend, there are no others that contain both the stabilizing colloids and the balancing salts in the same product.

In regard to this contention, we find that the evidence clearly shows that the use of phosphate salts in a balancing product in cream stabilizers had been well known in the dairy industry for many years and had been used in many different cream stabilizers to prevent "feathering". Moreover, the evidence further demonstrates that the use of a phosphate salt has to be stated on the label of any product which contains such a salt, and that the labels thus posted on the products of Drew and Star, show, conclusively, that they contain different salts.

Finally, defendant Fenner testified, and there is no evidence to the contrary, that there exist considerable differences between the gums and the total amount of phosphates in the two products.

■ In the light of the foregoing evidence, we hold that there is nothing in the nature of a trade secret in the plaintiff's formula for its cream stabilizer, and, also, that the formulae used in this product by plaintiff and defendant, in fact, contain substantial differences.

The final products with which we are presently concerned are competing milk carrier vitamins which are marketed by the plaintiff and defendant.

■ In regard to these products, the plaintiff claims that the defendants illegally appropriated their trade secret by adding an edible emulsifier to their vitamins, without which, it is alleged, there would be a separation of the fat, instability, and a less smooth and homogeneous product. We find this contention to be wholly without merit because of the fact that the evidence shows conclusively that the vitamins sold by the defendant corporation have been, at all times, purchased by them from an independent manufacturer and resold exactly as purchased. Moreover, the evidence demonstrates that at no time has an edible emulsifier been purchased or used by the defendants in their vitamin product.

In view of the foregoing, it is our conclusion that plaintiff is not entitled to injunctive relief and damages sought.

■ It is also our conclusion, in view of the rather unusual factual situation relative to the production and marketing of a combination beaded emulsifier-stabilizer product after the institution of this suit, that the parties should each bear its own costs.

It is so ordered.