619 F.Supp. 621 (1985)
RE/MAX OF AMERICA, INC., Plaintiff,
v.
William H. VIEHWEG, Defendant.
No. 85-0349 C(3).
United States District Court, E.D. Missouri, E.D.
September 25, 1985.
*622 Peter W. Herzog, Thomas Lay Burroughs, Paul J. Seele, Herzog & Burroughs, St. Louis, Mo., for plaintiff.
*623 William H. Viehweg, Hazelwood, Mo., for defendant.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court for a decision on the merits of the claims of plaintiff, Re/Max of America, Inc., against defendant, William H. Viehweg. Plaintiff seeks a permanent injunction, monetary damages, and other relief. Defendant asserts various defenses.
The Court held a nonjury trial in this cause on June 3 and 4, 1985.
Having considered the pleadings, trial testimony, exhibits, stipulations, and memoranda of the parties, and being fully advised in the premises, the Court hereby makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff is a Colorado corporation doing business in the State of Missouri.
2. Defendant is a resident of the State of Missouri.
3. In March of 1984, the parties entered into an agreement whereby defendant was to work as a salesperson for the plaintiff to assist in the sale of Re/Max franchises in the St. Louis area.
4. In the years since 1974, plaintiff developed a network of affiliated real estate brokerage offices throughout the United States and Canada through the sale of franchises and subfranchises. Re/Max currently consists of some 740 franchises and 7704 sales associates.
5. Plaintiff has contracts with its subfranchisors-Regional Directors, who in turn establish franchises under contract within their respective regions. Plaintiff also has franchisees under direct contract. All of the aforementioned contracts produce revenue and income for the plaintiff. Furthermore, plaintiff also is the beneficiary of all Re/Max franchisees' contracts with their sales associates. Re/Max has expectancies of future revenues and income and contractual relationships of the same or similar nature.
6. After he was hired by plaintiff to sell franchises, defendant was sent to a management training course and a follow-up seminar in Englewood, Colorado, during the week of March 12-17, 1984. The purpose of the course and seminar was to prepare the defendant to represent the plaintiff in dealings with prospective and actual franchisees. During this period of time, defendant was furnished various business documents, including the Re/Max operations and training manuals, the Independent Contractor Agreement, sales and convention brochures, magazine articles, a sales kit, and a list of the top 100 agents for Re/Max.
7. Defendant claims that the materials furnished to him at the Colorado training program were a gift to him  his to do with as he saw fit. Plaintiff claims that the course instructor made it clear to all in attendance at the training sessions that the materials distributed were confidential and proprietary in nature. The Court finds the trainees, including defendant, were informed by Don Hackenberger that the various course materials were furnished solely to enable the trainees to represent plaintiff. Although some of the information furnished was not confidential in and of itself (e.g., information taken from multiple-listing services, magazine articles, etc.), the Court finds the representation of plaintiff made it clear this information was assembled by plaintiff for use on plaintiff's behalf, and not given to defendant for any use he alone decided upon.
8. Upon the completion of his training in Colorado, defendant returned to St. Louis and began his employment as a Re/Max franchise salesperson on Monday, March 19, 1984, where he reported to Robert Behrens. Defendant was given keys to the office and paid a commission of $1500.00 per month in the form of a draw on his monthly commission.
9. Over the next few weeks, defendant became disenchanted with plaintiff's operations and voiced his concerns to Behrens. *624 Defendant testified that he was concerned that information furnished him by the plaintiff was false and that by representing the plaintiff, defendant was participating in misrepresentation. Defendant claimed that prior franchises had not been terminated as he had been told. At trial, no evidence was introduced to show plaintiff was charged with any wrongdoing by any of the agencies defendant complained to.
10. On Saturday, April 7, 1984, defendant entered plaintiff's St. Louis offices and searched desks, closets, and credenzas in the office, including the desk belonging to Behrens. Defendant removed and read various documents and then took numerous documents, papers, and records home with him.
11. On Monday, April 9, 1984, Behrens discovered that the desks, closets, and credenzas had been searched and certain information and documents removed from the office. That same morning, Behrens confronted defendant upon his arrival at the office, and defendant admitted he had taken the materials in question. They argued about Re/Max's alleged misrepresentations, defendant refused to return the materials he had taken, and Behrens terminated his employment with Re/Max.
12. Subsequent to April 9, 1984, Behrens, Re/Max's Vice-President Don Hachenberger, and Re/Max's attorney Scott Smith, all sought the return of all the Re/Max documents in defendant's possession through a combination of telephone calls and correspondence.
13. At trial of this cause, defendant agreed to the return of the following materials, and all copies thereof: Defendant's Exhibits AA, UU, OO, AV, G, GG, L, K, EE, F, DDD, BB, CC, FF, I, DD, J, H, NN, MM, and Plaintiff's Exhibits 17, 15, 19, 16, 59, 25, 13, 14, 5, 6, 7, 8, 9, 10, 11, 12, 3, and 4; all of which this Court finds are the property of plaintiff. Defendant continues to retain documents furnished him by the plaintiff during his training period in Colorado.
14. Defendant is generally knowledgeable of these materials and their contents, including plaintiff's business know-how. Defendant admitted at trial that he sought to launch a consulting business that would benefit Re/Max's competitors based at least in part on knowledge extracted from these materials.
15. In late April of 1984, defendant contacted Gordon Gundaker, a St. Louis area realtor and Re/Max competitor, and offered to sell Gundaker information which would help him to keep Re/Max or its franchisees from hiring away his real estate agents.
16. In October of 1984, defendant sent mailings to thirty prominent St. Louis area realtors and Re/Max competitors to solicit their hiring of him as a consultant who would show them how to keep Re/Max or its franchisees from hiring away their real estate agents.
17. As a result of defendant's October 1984 mailing, defendant met with representatives of Gundaker Realty, Ira E. Berry Realty, and Century 21 Realty, wherein defendant offered to sell to each of those real estate companies information designed to help them keep Re/Max or its franchisees from hiring their real estate agents.
18. In a series of telephone conversations with plaintiff's officers on December 11, 14, and 18, 1984, defendant threatened to take his allegations of Re/Max's wrongful misconduct to the Federal Trade Commission and the Illinois Attorney General unless Re/Max paid him $15,000.00 in a lump sum, plus $3,000.00 per month for twenty-four months, and assigned him plaintiff's Florida region. Plaintiff rejected defendant's proposal by a letter dated December 21, 1984.
19. On February 4, 1985, defendant sent a mailing to over 500 offices of Re/Max subfranchisors and franchisees in which he accused Re/Max of improper registration of its franchise salespersons, of unsound financial conditions, and of making fraudulent statistical disclosure and false earnings claims.
*625 20. In the course of his contacts and mailings with plaintiff's competitors and franchisees, defendant disclosed and relied upon the material Re/Max had given him as well as materials he took from the St. Louis office.
21. Re/Max requested and was granted a temporary restraining order by this Court on February 12, 1985, prohibiting defendant from disclosing any Re/Max trade secrets or proprietary information, and from communicating with anyone in any way about Re/Max, except in response to specific requests from the Federal Trade Commission or the Illinois Attorney General.
22. At trial, plaintiff introduced evidence that prior to the February 4, 1985, mailing, Re/Max was on the verge of selling the New York State subfranchise to Mr. Pierre Titley of Montreal, Quebec, Canada. The contemplated cash down-payment for that sale was $65,000.00. Mr. Titley, as the owner of another Re/Max franchise, received a copy of defendant's February 4 mailing, however, and subsequently declined to complete the sale, citing his concern over defendant's accusations as a major impediment to the sale. In addition, plaintiff introduced evidence that, because of the drain on the time and efforts of Re/Max's officers, employees, and attorneys, plaintiff failed to complete its registration with the appropriate franchise regulatory bodies of North and South Dakota, and that this failure resulted in the delayed realization of approximately $8,000.00 for the sale of the Sioux Falls, South Dakota, franchise, and $12,500.00 for the Mandan, North Dakota, franchise. Plaintiff also offered some evidence in an attempt to show that it lost $126,888.00 in internal costs because of defendant's activities.
Defendant did not rebut plaintiff's evidence and continued to insist that his actions were proper.

Conclusions of Law
1. The Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states.
2. Plaintiff seeks the return of all remaining materials remaining in defendant's possession that were supplied by Re/Max during defendant's training, or that were taken from plaintiff's St. Louis office by the defendant. Plaintiff contends that these materials constitute trade secrets and proprietary information. Defendant appears to argue that he enjoyed the status of an independent contractor and therefore plaintiff waived any claim to the documents in defendant's possession because plaintiff had given him access to the same.
The Court finds, however, that the evidence of defendant's employment interviews, subsequent hiring, training, and assignment to plaintiff's St. Louis office support a determination that defendant was an employee of the plaintiff and not an independent contractor. See, e.g., Site Oil Co. of Missouri v. N.L.R.B., 319 F.2d 86 (8th Cir.1963); Cline v. Carthage Crushed Limestone Co., 504 S.W.2d 102 (Mo.1973).
3. It is well established that trade secrets include "any formula, process, pattern, device, or compilation of information which is used in one's business, and which gives him an advantage over competitors who do not know it or use it." Sandlin v. Johnson, 141 F.2d 660, 661 (8th Cir.1984) (8th Circuit construing Missouri law); see also Drew Chemical Corp. v. Star Chemical Co., 258 F.Supp. 827, 833 (W.D.Mo. 1966) (applying Sandlin definition). However, it is also held in Missouri that sales aids and materials entrusted by an employer to an employee do not rise to the level of trade secrets where they do not appear unique to a particular employer. Continental Research Corporation v. Schloz, 595 S.W.2d 396, 401 (Mo.App.1980). Minor adaptations of common business techniques to an employer's own particular needs do not raise such to the level of a protectible "trade secret." Id. The Court finds that the materials given to the defendant at plaintiff's orientation and training seminar are not trade secrets within the meaning of Missouri law. The evidence supports a finding that the training materials were *626 assembled and distributed in a fashion common to new employee orientation and much of the material itself was designed for presentation to the public and potential customers. The plaintiff's "100 percent commission" concept, though arguably unique, is not a trade secret. The concept itself is a product the plaintiff is attempting to market and one's publicly offered product can hardly be considered a trade secret.
4. The Court does find, however, that certain of the documents in defendant's possession at one time or another do meet the definition of trade secrets. Materials containing two years of referral rosters of franchised Re/Max offices and regional director/subfranchisor rosters including private home telephone numbers were developed over a period of many years, exclusively for the use of Re/Max personnel. Similarly, confidential lists of names of potential franchisees and confidential reports showing the sales produced by top sales associates and their commissions were compiled by plaintiff over a period and reflect a substantial investment of time and money by plaintiff, and Re/Max would suffer great competitive injury if these lists were to fall into the hands of competing franchisors who could then take advantage of Re/Max leads in their own franchising effort. Accordingly, the defendant will be ordered to return same to plaintiff.
5. Plaintiff further argues that the documents which defendant removed from plaintiff's St. Louis office were wrongfully taken. The defendant virtually concedes as much in his testimony at trial and in memoranda filed with the Court, and merely asserts that he did not think he was doing wrong at the time he surreptitiously removed the materials. The Court agrees that said documents were misappropriated by defendant. Accordingly, defendant will be ordered to return all materials taken from Re/Max's St. Louis office on April 7, 1984.
6. Plaintiff alleges that defendant's mailings and contacts with plaintiff's competitors constitute a tortious interference with plaintiff's business. The elements of the tort of intentional interference with business relations or business expectancies under Missouri law are as follows:
1. A contract or valid business relationship or expectancy (not necessarily a contract);
2. Defendant's knowledge of the contract or relationship;
3. Intentional interference by the Defendant inducing or causing a breach of the contract or relationship;
4. The absence of justification; and
5. Damages resulting from Defendant's conduct.
Fischer, et al. v. Forrest T. Jones and Co., 586 S.W.2d 310, 315 (Mo.1979); see also Downey v. United Weatherproofing, 253 S.W.2d 976, 980-81 (Mo.1953); Francisco v. Kansas City Star Co., 629 S.W.2d 524, 529 (Mo.App.1981).
7. The evidence at trial clearly established the existence of valid contractual and business relations between Re/Max and its twenty-six subfranchisors and 740 franchisees, and in turn between the franchisees and their 7704 sales associates. Express written agreements bind all of these parties. Also, Re/Max has the legitimate expectation of entering into business relationships with numerous potential franchisees, subfranchisees and sales associates.
8. Defendant's testimony showed that he was aware of the contracts and business relationships and contracts between Re/Max and others. As a Re/Max franchise salesperson, defendant was well aware of Re/Max's business expectancies.
9. The evidence showed that defendant's active and affirmative steps included letters to 560 existing Re/Max franchisees and subfranchisees. It also showed that defendant's actions included mailings to thirty of Re/Max's competitors in the St. Louis area, through which defendant sought to establish himself in the "consulting business" of obstructing Re/Max's potential business relationships with real estate agents.
*627 The Court finds that said evidence is sufficient to support a finding that defendant "actively and affirmatively took steps to induce the breach" and that "the Defendant's affirmative conduct caused the breach." Tri-Continental Leasing Co. v. Neidhardt, 540 S.W.2d 210, 216 (Mo.App. 1976).
10. The Court also finds the plaintiff's evidence sufficient to support a finding that plaintiff was damaged by the disruption of the New York agreements and the delayed sales of the Sioux Falls and Mandan franchises.
11. The key element in this case is whether defendant's actions were inherently wrongful or without justification. Francisco v. Kansas City Star Co., supra at 534. As discussed above, defendant's actions in taking, retaining, and utilizing materials taken from plaintiff's St. Louis office was wrongful. It is clear from the evidence that defendant attempted to justify his actions as an effort to compete for business with the plaintiff. His "consulting business" was in fact his effort to obstruct plaintiff's business for a price, using information wrongfully in his possession and his actions were not justified. In his discussions with the plaintiff, defendant even threatened to interfere with plaintiff's relationship with its franchisees unless plaintiff gave defendant an already successful region in Florida then under the competent direction of someone else. The Court does not find defendant's actions justified. Accordingly, plaintiff has established defendant's liability for intentionally interfering with plaintiff's business relations and expectancies.
12. The Court finds that as a direct result of defendant's tortious conduct, plaintiff was damaged in the amount of $65,000.00 lost as a result of the failure to close on the sale of the New York State subfranchise; $8,000.00 for the inability to sell the Sioux Falls, South Dakota, franchise; and $12,500.00 for the inability to sell the Mandan, North Dakota, franchise. The Court does not find that plaintiff proved that it lost $126,888.00 in internal costs as plaintiff claims. There was insufficient evidence offered at trial to distinguish between plaintiff's normal operating costs and those precise costs incurred directly as a result of defendant's tortious conduct.
13. The Court does not find that defendant was enriched by his wrongful possession and revelation of plaintiff's materials and trade secrets. However, Missouri courts have consistently held that injunctions lie for the tortious interference with business relationships and expectancies. See Engine Specialties, Inc. v. Bombardier Ltd., 454 F.2d 527 (1972); May Furnace Co. v. Conaway, 352 S.W.2d 40 (Mo.App.1961). Alternatively, there is precedent in Missouri for granting an injunction against the continued use of trade secrets or certain information retained by a former employee. See R.E. Harrington, Inc. v. Frick, 428 S.W.2d 945 (Mo.App. 1968); Opie Brush Co. v. Bland, 409 S.W.2d 752 (Mo.App.1966).
Accordingly, plaintiff's request for a permanent injunction will be granted.