**CARBOLINE COMPANY, Respondent,**

v.

**E. Dean JARBOE, William R. Keithler and Plas-Chem Corporation, a Missouri Corporation, Appellants.**

No. 53566.

Supreme Court of Missouri, Division No. 2.

May 4, 1970.

As Modified on Court's Own Motion for Rehearing or for Transfer to Court En Banc Denied June 8, 1970.

Sommers & Montrey, Barnard, Timm & McDaniel, St. Louis, for appellants.

Orville Richardson, John D. Pope, Blumenfeld, Kalishman, Marx & Tureen, St. Louis, for respondent.

PRITCHARD, Commissioner.

This is a case involving the alleged misappropriation of plaintiff Carboline Company's confidential information, data, trade secrets, know-how, formulations and processes in its manufacture of numerous products extensively used in industry as non-corrosive protective coatings principally for steel, iron and concrete. It is said that William R. Keithler, Carboline's former chemist technician employee, after leaving Carboline in December, 1960, took with him and divulged to Plas-Chem and E. Dean Jarboe, its president, to their knowledge, Carboline's trade secrets.

The greater issue involved on this appeal is the sufficiency of the evidence to support the broad injunctive relief granted to Carboline by the trial court. After the interlocutory decree of injunction, and a reference to an accountant for ascertaining the amount of damages and hearing Carbo-

line's exceptions to his report, in addition to the injunctive relief the trial court entered judgment for Carboline in the amount of $125,774.00.

In February, 1946, Mr. Stanley L. Lopata, who obtained degrees in chemical engineering and chemistry from Washington University in St. Louis in 1935, started Carboline. The nature and character of its business was to manufacture a number of special coatings to solve industrial major corrosion problems, such as where steel and concrete may corrode due to the environment or by the chemicals used in processing work. Over the years Carboline at much expense has had to build up a large research and development staff to do special work on coatings. In general, it manufactures and markets epoxy coatings and modifications thereof; zinc coatings; dielectric coatings; polyurethane coatings; high-temperature coatings based on silicon resins and modifications of resins; and polyvinyl chloride coatings. In its laboratory, Carboline investigates every new polymer which is developed by major chemical companies to determine if the polymer will solve a problem for Carboline's customers.

William R. Keithler came to Carboline in 1954, having had a background as a cosmetic chemist, and as a chemist in the specialty of industrial cleaning. Mr. Lopata gave him a job working with the development chemists in the laboratory. At the end of two or three years Mr. Keithler was made a group leader in the laboratory, and at that time helped Mr. Lopata as a special assistant in laboratory projects which Mr. Lopata was conducting in the basement of his home. When Mr. Keithler came to Carboline he had no experience in the corrosion resistant field. Whatever experience he gained was accomplished in Carboline's employ, 1955 through 1960.

According to Mr. Lopata, Mr. Rosenbaum (Carboline's vice president) and Mr. Tarlas (Carboline's vice president in charge of research and development), that company regarded all of the development information in the laboratory as confidential and secret.

Security precautions were always exercised in these particulars: laboratory notebooks were kept under lock and key; each chemist was required to turn in his notebook to the chief chemist every evening and periodic checks were made to insure that; laboratory personnel were instructed that under no condition were salesmen to be told of any of the ingredients of the coatings; suppliers were not told what the products purchased from them were used in; and such suppliers were interviewed in the front office or library, and were not permitted to go to lunch with sales people or technical people. These internal security measures have been used and enforced during Carboline's entire history.

Additionally, all chemist employees, on being hired, were required to sign a "secrecy agreement," such as Mr. Keithler was required to do shortly after he started with Carboline, "as a matter of policy." In pertinent portions those agreements, and the one signed by Mr. Keithler, provided that all inventions and improvements while employed shall belong to Carboline without further compensation. This sentence is contained in the agreements: "I further agree that I will treat as confidential and will not disclose any information concerning inventions, processes or methods concerning Company's business obtained by me while in its employ to any third party, without the written consent of an executive officer of the Company, whether during or after my employment by Company; and I further agree that upon the termination of my said employment, I will not take with me any drawings, blueprints, laboratory notes, formula sheets, or any other reproduction or copy of any confidential information concerning any of the matters hereinabove referred to, without the prior written consent of any executive officer of Company." The employee further agreed not to compete, in his own business, for two years after termination of employment.

Carboline's executive officers did not miss any confidential or secret documents from its plant after Mr. Keithler ceased em-

ployment. Mr. Keithler denied taking any papers with him except one sales catalog which he had permission to remove.

Carboline put into evidence many of its products (and those of Plas-Chem's which were claimed to be comparative to Carboline's) by way of sample bottles, catalyst liquids, and dried coating samples which were applied to metal plates, all being mounted on panels. A great deal of the testimony of Mr. Lopata and Mr. Tarlas was devoted to Carboline's manufacturing processes, its formulae for various products which are very obviously its greatest trade secrets. There was no direct testimony as to any precise formulation of any Plas-Chem product except three. Of Carboline's products, this is a general description given by the witnesses: The Phenoline 300 series of coatings consists of an orange primer, a black body coat (302), and a gray finish coat, all three with a catalyst. (The catalysts for all products are not described, but if such is claimed as a trade secret as to scientific balance and time of mixing, in view of the proof made of identity of some ingredients the lack of evidence as to the catalysts is not fatal. Catalysts are curing agents applied after the primer, body and finish coats, so as to cause the material to set in one solid mass.) The Phenoline series is one of the special protective coating systems extensively used in the atomic energy and chemical industries. It prevents leaching out of concrete into demineralized high purity water which has contact with reactors, thus preventing an accumulation of radioactive calcium and other ions which might otherwise come from the concrete. It is claimed that the three products of the Phenoline series are the same as Plas-Chem's three products, Chem Pon 2310 (primer, finish gray, and finish black).

Carboline's Epoxy 188 primer, finish white and finish gray are claimed to be comparative to Plas-Chem's 2105 and 2110 primer and finish coatings. Epoxy 188 is a modified epoxy coating system used to protect steel from corrosion. It was the first really permanent flexible epoxy coating brought on the market in the United States that did not depend upon thiokol or a polymer resin as a curing agent, and until Carboline brought it on the market epoxy resins would rapidly embrittle, peel and cake under stress. According to Mr. Lopata the development of Epoxy 188 was a matter of substantial research.

Carbo Zinc 11 is used to keep steel from rusting. It has two components: powdered zinc and a partially hydrolyzed ethyl silicate which when mixed together and applied to steel or cast iron the solvent in the vehicle evaporates and leaves a mixture of the vehicle and zinc on the surface. The vehicle absorbs water from the air or surface, if damp (hydrolyzation), and reacts to form a basic zinc silicate, a "galvanic" protection. On October 2, 1962, Carboline secured a patent on Carbo Zinc 11, the patent application being filed on June 4, 1959. Mr. Lopata and Mr. Keithler were named as assignors to Carboline in the patent. Up to the time of this patent Mr. Lopata considered Carbo Zinc 11 one of the "very, very precious secrets" Carboline had. It was one of their very best products. Plas-Chem announced its product "Zincite", and Carboline, feeling that it infringed its patent on Carbo Zinc 11, obtained a sample of it and had it analyzed by Scientific Associates which confirmed Carboline's feeling. A patent infringement suit ensued, which was settled. Plas-Chem informed Carboline that a new product called Zincite B was being put out which did not contain a partially hydrolyzed silicate which Mr. Lopata said "could in no way be construed as infringing on our patent." Nevertheless, Carboline claims that Zincite B, which contains a titanium base, is the subject of a purloined, divulged trade secret in this: During laboratory work, Mr. Lopata discussed with Mr. Keithler changing from a silicon group in Carbo Zinc 11 to a titanium group and asked him to perform some experiments on it in an effort to combine the materials with zinc to perform a different type of inorganic zinc coating. Mr. Lopata also did some work on this and found that

"we could get an inorganic galvanic coating." He thought the silicon approach was better than the titanium approach, and "we did no further work on this until after Mr. Keithler left the company."

Carbomastic No. 3 is a coating made from a mixture of epoxy resins and a coal tar, which mixture is called the vehicle. There are added some inert fillers and a pigment. The result of these combinations gave a product which showed a better resistance to salt water and hot water than any product on the market. It would show no "undercutting" which is the rapidity with which rust creeps along a damaged coating and which lifts a good coating from the surface. Approximately four years before the trial, Carboline was sued by Pittsburg Coke and Chemical Company for claimed patent infringement of its coal tar coating product by Carboline in its Carbomastic product. That suit was settled and as a result Carboline sold a patent and a patent application (for $32,500.00) to Pittsburg, which in turn and pursuant to a stipulation of the sale gave a license to Carboline to manufacture and sell the Carbomastic line under the patent and under the pending patent if secured. Mr. Lopata's position as to this patent-sale-license arrangement is not clear. He claims in his testimony that there is no patent held by Pittsburg for a product like Carbomastic. The patent is "for a product consisting of *epon* resins and coal tar pitch —they do not have a patent covering *epoxy resins* and coal tar" (italics added), which product Carboline sold. On cross-examination this question was asked and this answer was elicited from Mr. Lopata: "Q. And it's within the range or the area covered by the patent, otherwise you would not need a licensing arrangement? A. No, the patent doesn't cover that—the patent merely covers a mixture of *epoxy* resins and a coal tar pitch and it doesn't cover anything else." (Again, italics added.) As to the confidentiality of Carboline's processes, Mr. Lopata had this to say with respect to the Carbomastic line: "In no cases I can think of did somebody give their basic or con-

fidential know-how in a patent like this. In some instances, you have to when there is only one way to solve a problem. * * * What we turned over to Pittsburg Coke were fillers we were using or how these were put in, that's completely confidential." Pursuing the Carbomastic matter further, it was developed from Mr. Lopata that he claimed it to be not quite right that Carboline is now selling Carbomastic 3 by a licensing agreement because, although Carboline submitted a patent application to Pittsburg, it never pursued it through the patent office. "Therefore, to my knowledge, the only people who should know what is in Carbomastic would be Pittsburg, because the patent has never been issued on the proper procedure. Q. But it is being sold under a license arrangement? A. Yes, sir, that's correct. Q. Has Pittsburg Coke and Coal issued this licensing arrangement to anyone else? A. Under the patent, which calls for the coal tar pitch, yes, I would say they have fifteen or seventeen licenses in the United States, but to my knowledge, they have never told anyone about the development of—Q. Well, is that the license arrangement under which your Carbomastic is sold? A. Yes." Mr. Lopata went on to say that Carboline's (Carbomastic) product is really different from the patent from which the license flows. "Q. Now, if I'm clear and I understand, the patent and licensing situation of the formulation for the Carbomastic 3 was the subject of a patent application which you sold to Pittsburg Coke and Chemical but which was never issued? A. That's correct." Pittsburg is not aware of the formula for Carbomastic 3; all they know is there is a refined coal tar and an epoxy resin; and it is exactly right that Pittsburg paid $32,-500.00 for the patent application not knowing how the product is made. Pittsburg's request that Carboline reveal its trade secrets and know-how in the Carbomastic products was refused by Carboline. As far as Carboline knows, the patent application has never been brought to issuance by Pittsburg "since they have had control of it."

Carboline also manufactured a hi-dielectric (HD) three-coating system called HD-1300. This was used for heat insulation of the tops of electrical transformers. Apparently squirrels, birds, snakes and some animals would get on top of transformers for warmth and would sometimes cause short circuits and consequent electrical outages. The product was developed to meet that problem, and later HD-1300 was improved into a two-coat system called HD-2300 by Carboline. Both of these products were developed at the behest of the Moloney Electric Company and were sold to it. Plas-Chem in 1959 was also contacted by Dr. Stout (Moloney's consultant) relative to the problems in hi-dielectric coatings, and did work on and developed (in May, 1962) a three-coat product called Chem Thane 2800 series which Carboline claims to be comparative to its HD-1300 series. Moloney did not use Plas-Chem's three-coat system, and its later developed two-coat system was rejected by Dr. Stout as being inferior to Carboline's two-coat product.

To make its case Carboline depends largely upon circumstantial evidence. Among this type of evidence is Mr. Keithler's access to formulations data of Carboline's products and research in its laboratory; the required time for developing and testing of products as related to the speed with which Plas-Chem brought comparative products on the market after Mr. Keithler entered its employ; and the sameness or similarity of Plas-Chem's product data sheets to those of Carboline. As to this latter matter, Mr. Lopata testified that sometime in the Spring of 1962 Plas-Chem came out with a book of bulletins outlining a number of products which seemed to indicate they were identical to those Carboline had on the market. "Our claim is that the Plas-Chem Company purloined these formulations," and "were equal products based on the formulations obtained from Mr. Keithler." The Plas-Chem sheets were the first ones that went into the great detail that Carboline

went into, and outlined a comprehensive series of test results which Carboline had outlined, "and unless someone had spent these ten thousand of hours we mentioned, they could not have published the results unless they had had the formulas." According to Mr. Lopata, Plas-Chem did not have any bulletins published until after Mr. Keithler went to work there. He did not know what Plas-Chem might have had or said they had, but could go only by a public announcement. Carboline's own catalogs, from which it is said that Plas-Chem's product data sheets are copied, do not disclose or set forth to industry any claimed trade secrets, any information of a confidential nature, any manufacturing know-how of its products, or any formula or formulations data identifying the amount of chemical ingredients. Only the generic type of resins (the family of resins) is disclosed. It would not be possible for a chemist to formulate, develop and duplicate Carboline's products from the information contained in this literature which was only to give engineering information to the customer.

Carboline's Mr. Hercules D. Tarlas inspected Plas-Chem's three product catalogs and prepared charts of products therein contained which were similar to Carboline's. In comparing the data and the "complete similarity of the products," Mr. Tarlas opined that "there is only one conclusion anybody can draw, that the two products are the same * * *." He testified that one would have to test products a minimum of one to one and a half years, some two years, to put products on the market. Certain secret formulations of Carboline's products were given by Mr. Tarlas, and also a description of Carboline's testing equipment. He testified further, "Q. What, if any, conclusion can you draw from a technilogical comparison of these two bulletins? A. In order for the products to perform the same, they would have to be the same in the container," and on cross-examination he stated his conclusion, "That for two products to

have the exact, exactly the same chemical and physical characteristics in a chart, they must be the same in content." Daniel H. Gelfer, a research director of the Amercoat Corporation of California (a competitor of Carboline, which Mr. Gelfer said was a great imitator of his company's products), testified as to comparing data sheets: "Well, I have examined the data sheets of both companies product-by-product as described in the data sheets and there is a great parallelism with respect to almost every property on the data sheet, as I see it, and I, as a chemist, would feel there is a very strong possibility of the parallelism of composition in order to come out with these same properties—this is something I can't be sure of beyond any doubt, but there is that strong belief in my mind, as a chemist, as I look at these data sheets." Laboratory reports of the two companies were in evidence. Mr. Tarlas claimed that Carboline's report (issued to industry) was unique, but that Plas-Chem's report appeared to be quite comparable as to general conclusions reached. He conceded that a number of Plas-Chem's tests as shown on its laboratory report are not in Carboline's, and that its competitor, Amercoat Corporation, had laboratory test reports of its epoxy coal tar which were comparative to Carboline's. As to competition in the coating fields, Mr. Tarlas conceded further that it was normal for manufacturer "A" to try to have a product competitive with a successful product of manufacturer "B." Mr. Tarlas did not know for sure what the formulations are for the various Plas-Chem's products in controversy in this case.

William C. Rosenbaum, Carboline's vice president, and a chemical engineer with duties chiefly in administration, procured samples of Plas-Chem's products and engaged Dr. Carl D. Gutsche, a professor of chemistry at Washington University, to analyze them. By an infrared spectrographic process Dr. Gutsche made paper tracings of two products: Epoxy 188 and Plas-Chem's Chem Pon 2110–3 Gray. He testified that the products were identical. As shown by the spectrograph tracings, "The picture one gets is referred to even by scientists as a fingerprint, and I think this is self-defining term. The pattern that one gets from any particular molecule is unique to that molecule, just as a fingerprint is unique to a given individual. * * When unknown samples A and B, therefore, are put into the infrared machine and found to have superimposable infrared spectrum, identical infrared spectrum, the scientist accepts this as compelling evidence for the identity of these materials." Dr. Gutsche did not make other spectrographic tracings. They were submitted to Dr. John Eibert, president of Scientific Associates, for analysis. Dr. Gutsche did, however, examine tracings made by Dr. Eibert of products Chem Pon 2310 and Carboline's Phenoline 300, and of Carbo Zinc 11 and Plas-Chem's Zincite Base, and concluded that the two products were identical. As to the latter the tracings are "superimposable in detail and one again is forced to the conclusion that the two materials are identical." Mr. Jarboe, of Plas-Chem, during the course of the trial, procured two Epon resins, took them to Prosper Louis Soucy, a technician in infrared spectrograms for Emerson Electric Company, instructed him to mix the materials half and half, and run them through the spectrographic machine. According to Mr. Jarboe, the resultant tracing was identical to the Chem Pon and Phenoline 300 tracings made by Dr. Eibert. Oddly, the tracings of Carbo Zinc 11 and Zincite Base, the latter containing titanium (as is clear from the record) instead of Carbo Zinc's ethyl silicate, being different ingredients, were said to be superimposable.

Dr. Eibert gave his conclusion that the three sets of spectrogram tracings (Dr. Gutsche's tracing, and his own tracing of products Carbo Zinc 11 and Zincite Base; and analysis comparison Carbomastic and Chem Mastic ingredients) indi-

cated a quantitative similarity in the samples. They do not differ in any detail. "My conclusion would be that the products are identical." Dr. Eibert made 25 spectrograms of other Plas-Chem products which were not in evidence. He used those in evidence which he felt most honestly reflected a fair comparison of the products, and picked out the ones they thought were the most accurate—which most nearly matched Carboline's product tracings.

As to the hi-dielectric product lines (for transformers) of the parties, Dr. Lawrence E. Stout, a chemical engineer and college professor, also a consultant for Moloney Electric Company, testified that Carboline was the first company to submit to him a test panel of HD-1300, a three-coat system that Moloney used quite awhile. Then Carboline submitted a two-coat system (HD-2300) which Dr. Stout recommended. Plas-Chem submitted a proposed hi-dielectric coating to him in 1960 or 1961, and Dr. Stout suggested it look into a urethane coat and acrylic top finish and submit them. After 1962 Plas-Chem did submit samples, but they did not meet Dr. Stout's requirements. A two-coat system was submitted by Plas-Chem on August 1, 1962, which had about half the insulating value of Carboline's HD-2300, and was not satisfactory. On May 29, 1962, Plas-Chem furnished the three-coat Chem Thane 2800 which was close to HD-1300, but Moloney was then using a two-coat system.

William R. Keithler started work for Plas-Chem in February, 1962. From 1947 until 1954 he had worked as a laboratory technician in several companies, none of which was the business of producing non-corrosion products. In 1954 he went with Carboline for six years (until the middle of November, 1960). Beginning about that time he discussed the possibility of employment at Plas-Chem with Mr. Jarboe three or four times along the lines of relieving Mr. Jarboe of some of the detail work, rounding out Plas-Chem's corrosion line and architectural line, and seeing that all its literature was brought up to date.

Mr. Keithler did not immediately go with Plas-Chem, but went to Illinois Bronze Powder Company in Chicago for about a year, worked with Standard Toch Chemical Company for two months, then called Mr. Jarboe and employment with Plas-Chem ensued. During the meetings with Mr. Jarboe, Mr. Keithler denied disclosing any formulations, secret know-how, or secret processes that he had learned or worked with at Carboline. He did not take with him any laboratory books, papers or sheets from Carboline when he left its employ (because he felt there was no future there), nor did he copy any. During all the time he has been with Plas-Chem, Mr. Keithler has not disclosed to anyone the formulas, secrets, secret processes or know-how of Carboline. He has used, or made use of, the knowledge he acquired while at Carboline.

Plas-Chem had an incomplete catalog of its products so Mr. Keithler, with Mr. Jarboe, started working on a new one, which came out in early April, 1962, for the corrosion and architectural fields and for advertising programs. He has formulated various products as the need arose, and he supervises quality control. Mr. Keithler had forgotten the existence of the document he signed relating to inventions and confidential matters of Carboline. He first told Mr. Jarboe about that document when they received a letter from Carboline and its attorney (apparently in regard to patent infringement as to Plas-Chem's original product, Zincite). On cross-examination Mr. Keithler acknowledged that he had represented himself as having had a college education when in fact he did not have such education as would qualify him for a position as a chemist. He had access to all confidential know-how, all formulas, secrets, information as to inorganic zinc products, had a vague idea as to the Epoxy 188 line and access to its formula cards in the safe, as also he had as to the Carbomastic

3 and 12 lines. He had access to different types of testing equipment, knew how those machines worked and could interpret and evaluate them. He knew that corrosion resistant coatings have to be subjected to rather thorough and lengthy testing to determine if they would stand up under exposure to corrosive environments. When Mr. Keithler came to Plas-Chem it had in existence "just about everything except an inorganic zinc coating." `Chem Pon 2310 (comparable to Carboline's Phenoline 300 series) was in existence at that time, but under a different number. It was a commercially salable number, but there were some revisions. He did a formula for Chem Mastic (comparable to the Carbomastic line) and Chem Pon 2110 (comparable to Epoxy 188 line) after he came with Plas-Chem.

In making up Plas-Chem's first catalog, Mr. Keithler used technical data and consultant data for the type of information required on a data sheet, such as put out by Amercoat Corporation, Plasite Company, as well as Carboline. He made tests on the reformulated product Chem Pon 2110 from February until April, 1962, to determine. if it had excellent resistance to acids, alkalis, salts and water. Weathering data was based upon general knowledge that vinyl components have good weathering properties. As flash point data he took that of the lowest solvent contained in the material. On Chem Pon 2310 there was a great deal of immersion testing. He "spot tested" most of the materials, taking a pretty short time. In the hydrochloric ten percent test, he got a discoloration of the liquid about overnight, "Generally, if they are going to fail, they fail fairly rapidly." Mr. Keithler actually conducted the tests, and some took as long as two months.

When Mr. Keithler first came to Plas-Chem he formulated an inorganic zinc coating (based on a partially hydrolyzed ethyl silicate, which was patented by Carboline). Then Plas-Chem changed its formula to a titanate-base material, the idea being conceived by Mr. Jarboe. Mr. Keithler did have experience with titanates while with Carboline, but he felt that titanate would never work. The experiments at Carboline were a failure, "the films that we got from titanates were considerably inferior to the ethyl silicate types." He worked night and day for about a month to develop Zincite' B, with titanate in it.

E. Dean Jarboe, a chemist thirty-eight years of · age, started his career with Dennis Chemical Company in 1951, working on every type of generic coating: acrylics, vinyls, epoxies, urethane, alkyd and neoprene. Subseqently, with Celucoat Company, he formulated its added lines of vinyl epoxy and some urethanes, and organized Plas-Chem in 1958. He owns the controlling interest in Plas-Chem and is its president. He started ·the business with five employees, at which time he had no official catalog but did have some data sheets which he carried with him on sales which he then made himself. At the end of its first year Plas-Chem had seven series of epoxy coatings and eight or nine vinyl corrosion resistant coatings and urethanes (fifty-nine products in all). By the time Mr. Keithler came with Plas-Chem it had thirteen employees and two salesmen in the field. During 1962, twenty-one products were added, including Zincite and Zincite B thinner. In 1963 and 1964 twenty-five products were added, including Zincite B.

Mr. Jarboe, in his testimony, described extensively the ingredients in his products and denied that they were the same or equivalent to those in Carboline's coating products.

As to the hi-dielectric product for transformers, the Carboline product had produced the necessary dielectric quality, but Plas-Chem's product did not, even after Mr. Keithler came with it. Plas-Chem uses none of several products which are used in Carboline's HD-1300. Mr. Jarboe did the work on Zincite B after

abandoning Zincite and Zincite A because of patent infringement upon Carboline's Carbo Zinc 11.

As to Plas-Chem's testing equipment, Mr. Jarboe testified that it had a salt spray cabinet, access to a weatherometer, a high temperature muffle for running heat tests, several ovens for running elevated and accelerated tests, and ordinary facilities for running acid, alkali and salt tests (glass jars with caps).

It is clear that Carboline possessed many trade secrets in the manufacture of its various lines of protective coatings. Such trade secrets, in general and according to the record, encompass the use of synthetic resins, epoxies, vinyls and other chemical ingredients in combination to produce a chemical reaction resulting in a product designed to meet industrial problems in the protective coating field. The specific secrets, as testified to by Mr. Lopata and Mr. Tarlas, are in the use of materials, their proportions or amounts used, the order and time of adding the materials, their mixing, and the testing thereof to ascertain if the desired result is reached. The manner in which a product is manufactured is contained in various laboratory cards as to specific formulas. The formulas are strictly and elaborately guarded in Carboline's plant and are kept in locked safes. Employees in the chemical laboratory are required strictly to account for their notebooks, periodic checks being made to see that they turned in such notebooks at the end of each work period. Employees were warned not to divulge formulations to salesmen. Suppliers of materials and other outsiders were not allowed to enter the laboratory-manufacturing areas of Carboline's plant, and employees therein were not permitted to lunch with suppliers. And, more importantly, each employee in chemistry was required to sign a secrecy agreement in which the confidentiality of products was recognized, and in which each employee agreed not to divulge inventions, processes or methods concerning Carbo-

line's business either during or after employment. The situation thus vastly differs from that in National Rejectors, Inc. v. Trieman, Mo., 409 S.W.2d 1, where there was no plant security and no binding of employees in contracts of secrecy, hence there were no legally protectible trade secrets as was held. The facts here showing elaborate care in protecting formulations and processes are more in accord with those in the footnoted cases at page 22 of the National opinion, notably Winston Research Corp. v. Minnesota Min. & Mfg. Co. (9th Cir.), 350 F.2d 134. There is an additional factor which is the result of Carboline's internal security precautions for the protection of its secrets: It had been enabled to attain an ascendancy, a definite advantage, over competitors who manufacture and market similar products. Noteworthy is its successful and sole development of its hi-dielectric coatings (HD–1300 and HD–2300) for electrical transformers for Moloney Electric Company. The facts to be considered in determining the existence of trade secrets as set forth in Restatement of Torts, § 757, and adopted in the National opinion (409 S.W.2d 18 [2]), are here sufficiently present.

■ But the difficulty in the review of the extensive record and numerous exhibits in this case lies not in a determination merely of whether Carboline possessed trade secrets. It lies in whether the proof sufficiently shows that Plas-Chem, through Carboline's former employee, Mr. Keithler, wrongfully acquired and used any (or what) of Carboline's secret formulas in products developed after Mr. Keithler entered Plas-Chem's employ on February 1, 1962. That proof must necessarily be of such a nature, in the highly technical field of chemistry, to demonstrate that the actual formulae of Carboline's products are the same as were actually used in Plas-Chem's competitive products, so as to support the trial court's sweeping injunction as hereinafter set forth. The burden of proof on the issue is, of course, upon Carboline. B. F. Gladding & Co. v. Scientific Anglers

(C.A.6th), 245 F.2d 722, 728 [2, 3]; Drew Chemical Corp. v. Star Chemical Co. (D.C. W.D.Mo.1966), 258 F.Supp. 827; Sandlin v. Johnson (D.C.W.D.Mo.1944), 57 F.Supp. 374, affd. 8 Cir., 152 F.2d 8; Godefroy Mfg. Co. v. Lady Lennox Co., Mo.App., 134 S.W.2d 140, 146 [2, 3]; 42 Am.Jur.2d Injunctions, § 26, p. 760.

With respect to the certainty of identity of some Carboline formulas and some Plas-Chem formulas, the evidence shows these: Carboline's two well-qualified experts, Dr. Gutsche and Dr. Eibert, in making and testifying to results of infrared spectrographic tests found that Carboline's Epoxy 188 and Plas-Chem's Chem Pon 2110, Carboline's Phenoline 300 and Plas-Chem's Chem Pon 2310, Carboline's Carbo Zinc 11 and Plas-Chem's Zincite Base, were superimposable on tracings, and the analysis comparison of Carbomastic and Chem Mastic, so as to be "compelling evidence for the identity of these materials." This evidence, which was for the trial court to determine as to the credibility of the witnesses testifying thereto (including evaluation of facts that Carboline failed to produce spectograms of some twenty-five other products, of Mr. Jarboe's tracings of a mixture of two Epon resins producing similar results, and that Zincite Base with titanium produced a tracing identical with Carbo Zinc 11 containing no titanium), must be deemed substantial that these products were *formulated* of the same materials and in the same proportions of materials. With Mr. Keithler's access to the formulae at Carboline's plant, the speed with which Plas-Chem put them on the market, the fact that the data sheets of both companies on these particular products are very similar *coupled with* the infrared spectrogram tracings showing identity of materials, establishes with reasonable certainty the inference that Mr. Keithler supplied the formulae to Mr. Jarboe, who under the circumstances must be held to have known they came from Carboline's secret files.

As to the hi-dielectric products, the identity of the formulations of Carboline's HD-

1300 and Plas-Chem's Chem Thane series 2800 is sufficiently and substantially established by the testimony of Carboline's witnesses and Mr. Jarboe. Both contain the same key ingredient. Two other ingredients of the same series are used. Additionally, as to the hi-dielectric product, the circumstantial evidence shows that Plas-Chem was unable to formulate a satisfactory coating for Dr. Stout for use on transformers until May, 1962, shortly after Mr. Keithler came with it. At that time a comparable coating to Carboline's three-coat system, HD–1300, was submitted, but was not used by Moloney Electric Company, and Plas-Chem never did perfect a two-coat product, as did Carboline, after Mr. Keithler left its employ.

Carbo Zinc 11 was a patented item of Carboline. Thus it would not be entitled to any relief in this tort action for misappropriation of a trade secret, its formulations necessarily being revealed in the patent. Sandlin v. Johnson (C.A.8th), 141 F.2d 660, 661. But Carboline is not limited to a patent infringement suit as to the use of Butyl Titanate Esters in Plas-Chem's Zincite B. The evidence of the use of titanate base in Carboline's experiments does not conclusively show a failure as Plas-Chem contends. That evidence came from Mr. Keithler, and it was for the trial court to determine that Carboline had a formula employing titanate for use in zinc coating products. Note that Mr. Lopata testified that by use of a titanium group he found that they could get an "inorganic galvanic coating." He thought that the silicon approach (in Carbo Zinc 11) was better and did no work on the titanium approach until after Mr. Keithler left Carboline. Mr. Keithler, having participated in this experiment, knowing of the formula and being bound by his contract not to divulge the same, even after ceasing employment, was under a duty not to divulge it. The facts and circumstances as to the formula for a titanate base zinc coating, as contained in Plas-Chem's Zincite B, lead to the conclusion that Mr. Keithler fur-

nished to Mr. Jarboe and Plas-Chem information as to this product, a trade secret of Carboline.

Plas-Chem contends that Carboline necessarily divulged its secrets and "know-how" in its Carbomastic 3, 5 and 12 products by reason of a sale of an existing patent and a patent application to Pittsburg Coke and Chemical Company. It is said that by reason of the patent, the formula for Carbomastic was no longer secret. (This would be true under 35 U.S.C.A. § 112 requiring the manner and process of making and using a product be revealed in the specification of an invention so that one skilled in the art could make and use it. See also Reddi-Wip, Inc. v. Lemay Valve Company, Mo.App., 354 S.W.2d 913; Sandlin v. Johnson, supra (141 F.2d 660); and Dow Chemical Co. v. American Bromine Co., 210 Mich. 262, 177 N.W. 996.) While Mr. Lopata's testimony on the subject of this patent-sale-license arrangement was somewhat indefinite and equivocal, yet Plas-Chem's argument ignores his further testimony with respect thereto. That testimony was that Carboline did not turn over to Pittsburg any of its trade secrets with respect to Carboline's Carbomastic product which it manufactured and sold under a license. The specific trade secret concerned in part the adding of a rust inhibitive agent and another compound, neither of which, according to Mr. Lopata, had ever before been used in the industry in such products. The spectrographic analyses and Dr. Eibert's further analysis of the similarity of red lead content in the Carbomastic and Chem Mastic products, with the other evidence in the case, lead to the legitimate conclusion that the latter product was developed by Plas-Chem after Mr. Keithler entered its employ, and by use of secret formulae to which Mr. Keithler had access.

The trial court's judgment, in paragraph (a), enjoined defendants "From manufacturing, using, selling, distributing, formulating for themselves or any one else or having any one else manufacture, formulate or compound for them," in addition to the five Plas-Chem product series above discussed, these products: Chem Flex 1610 HiBuild, Chem Flex 1820 Top Coat, Chem Thane 2801 Build Coat, Chem Thane 2802 Top Coat, Chem Mastic 2200 Aluminum, Chem Mastic 2201, Chem Pon 2312, Chem Pon 2313 Finish, Chem Pon 2314 Primer, Chem Pon 2314 Finish, Chem Flex 1620 Primer, Chem Flex 1620 Body Coat, Chem Flex 1620 Seal Coat, Chem Flex 1814, Chem Flex 1905 Primer, Chem Flex 1905 Finish, Chem Thane 2803 Floor Coating, PCC 5102 Silicone, Tite, and Chem Flex 1022 Stripcoat, 5551 SW. Paragraph (b) of the judgment enjoined defendants from soliciting or accepting orders for corrosion resistant and industrial coatings used in preparation of products listed in paragraph (a), "or other products which are substantially similar thereto."

Paragraph (c) of the judgment enjoined defendants from using Carboline's formulae and know-how in its products (additionally to those discussed above as to proof): Polyclad 933-3, Polyclad 120-1, Carboline 131 Build Coat, Carboline 1302-3 Finish, Phenoline 303, Phenoline 315 Finish, Phenoline 305 Primer and Finish Old, Polyclad 923 Primer, Polyclad 955 Body Coat, Polyclad 955 Seal Coat, Carboline OE Finish, Fluorline 100 Primer and Finish, Polyclad Strip Kote, Corclad M 4, Adhesive 1-VH, Adhesive AXE-3, Adhesive XA 2EP, Adhesive XA 3EA, Adhesive XA 5EP, B-10 Resin, Carbo Fix, Carbo Fix C, Carbo Fix S Carbo Flex, Carbo Kote 6020, Carboline ACJ-6 Primer and Finish, Carboline X1301 66 Finish, Carboline 2109, Carboline 2710 Primer and Finish, Carboline 2711, Carboline 3520, Carboline 3912, Carboline 4631, Carboline 6003 Primer and Finish, CarboMold, Carbo Zinc 11, Caulking Compound 225, Caulking Compound 701-55, Caulking Compound 702, Caulking Compound 703, Caulking Compound 704, Caulking Compound 705, Caulking Compound 706, CK Resin, Concrete Adhesive 192, Concrete Adhesive X2200-1, Corclad F-6, Epoxy 150 Primer and Finish, Epoxy 154, Epoxy 180-25, Epoxy 183 Floor

Coating, Epoxy 186 Primer and Finish, Epoxy 190 Primer and Finish, Epoxy 190 Clear, Epoxy 190 Finish with Silica, Epoxy 194 Floor Coating, Epoxy 224 Primer and Finish, Hard Top 3, Millclad 2100, Neoprene Adhesive F–1, Neoprene 100 Primer and Finish, Neoprene W. Primer and Finish, Phenoline 301, Phenoline 302, Phenoline 305 Finish with Special Silica Filler, Phenoline 305–2, Phenoline 315 Black, Phenoline 315–5, Phenoline 315–5 Adhesive, Polyclad Clear Primer, Polyclad Cover Kote, Polyclad Primer 10, Polyclad Primer 923, Polyclad Web Spray, Polyclad 120–1, Polyclad 120–1–DG, Polyclad 120–1–GH, Polyclad 933–1, Polyclad 933–1 Spray Grade, Polyclad 933–1–DG, Polyclad 955 Primer, Pool Pride, Rustbond Primer Standard, Rustbond Primer 5, Rustbond Primer 6, and Rustbond Primer 150E.

■ Some of the items listed above are contained in charts prepared by Mr. Tarlas from information taken from published data sheets of Plas-Chem and Carboline as to eighteen products. He and Mr. Lopata testified that the similarity of data led them to conclude that the products were identical. Mr. Gelfer was not so positive as to identity, but felt there was a strong possibility of parallelism, a strong belief in his mind, as to the products on the data sheets, but it was something he could not be sure of beyond any doubt. This evidence derived from comparing data sheets, not secret and disclosing no formulae, is insufficient to establish the identity of formulae, the identity of ingredients, which is the very basis of Carboline's claim of misappropriated trade secrets. Carboline cites cases of Hoeltke v. C. M. Kemp Mfg. Co. (C.A.4th), 80 F.2d 912, and Smith v. Dravo Corp (C.A.7th), 203 F.2d 369, for its contention that the similarity of the products is strong proof upon which misappropriation of Carboline's products may be found. The similarity of the products is present from the proof here of the above-mentioned five-product series, and as to those five series is a sufficient basis

"standing alone" to show that Mr. Keithler incorporated Carboline's formulae in the comparable and swiftly produced matching Plas-Chem product series. But that proof does not establish by inference or otherwise that formulae in all the other products listed in the trial court's judgment were purloined and used. In order to support the trial court's judgment of injunction as to *all* products listed above and beyond the five-product series, that proof must be present. This is especially true in view of Mr. Jarboe's long experience (since 1951) in formulating various types of generic vinyl and epoxy coatings, and those which Plas-Chem produced and sold prior to the time Mr. Keithler entered its employ. The judgment would have the effect of putting Plas-Chem out of its properly developed business, past and future, and prevent it from utilizing its own trade secrets which the evidence shows it possessed. See Levine et al. v. E. A. Johnson & Co. et al., 107 Cal.App.2d 322, 237 P.2d 309.

■ Plas-Chem suggests that the injunction should not be made permanent, but should be limited in time by application of the "head start" rule: "That period of time which would have been required by defendants to reproduce plaintiff's products without wrongful appropriation." It was indicated in the National case, supra (409 S.W.2d 54), that this state would apply the "head start" rule of Conmar Products Corp. v. Universal Slide Fastener Co. (2d Cir.), 172 F.2d 150, which precludes a defendant from using a misappropriated trade secret only for such time as it is not made public. See also Winston Research Corp. v. Minnesota Min. & Mfg. Co., supra, and Levine et al. v. E. A. Johnson & Co., et al., supra. In the case of Shellmar Products Co. v. Allen-Qualley Co. (C.A.7th), 87 F.2d 104, it was ruled contrarily that an injunction could be granted against defendant's use of a trade secret even though its secrecy had already ended or could be discovered by independent analysis. As in the National case, there was here no attempt to

establish the time within which Plas-Chem, with its original staff and manpower, could have discovered Carboline's formulae secrets in the five-product series above mentioned. Carboline's evidence tended to show that chemical analyses of such products would be a major project. Since this case must be remanded to ascertain the damages to Carboline for the misappropriation of its secret formulae in said five-product series, Plas-Chem should be given the opportunity to establish the "head start" time as to these products, and the injunction should be limited to that period of time if shown. As to the application of the "head start" time to money relief to which Carboline is entitled Carboline urges that such was not presented in Plas-Chem's motion for new trial and is not presented for review. It is true that the motion does not specifically set out that proposition. It does, however, vigorously attack the damages awarded as being excessive, that the referee's report on the subject was erroneously rejected, and that Carboline's exceptions to the report were wrongfully sustained—all going to the accounting methods employed in fixing damages. If upon further proceedings the time within which Plas-Chem could have (as of November 30, 1960) by independent analyses determined Carboline's ingredients in the five-product series is established, damages, being Plas-Chem's net profits from sales of the items, should be limited to such time.

■ The trial court appointed E. J. Schorb, a certified public accountant, as referee to determine from Plas-Chem's records its profits made from the sale of products listed in Paragraph 6 of the court's interlocutory judgment (par. (a) of the final judgment). He reported to the court that he found $23,004.50 for the products for the period February 1, 1962 until May 15, 1966. Carboline filed exceptions to the referee's report and a hearing was had thereon, during which it was stipulated that Mr. Edwin Lopata would testify that Plaintiff's Exceptions Exhibit 8 (so

marked but not offered in evidence) was prepared by him and was considered by him to be accurate. That exhibit (which is attached to Plas-Chem's brief although not received in evidence) apparently forms the basis for the trial court's determination of Plas-Chem's net profits on enjoined products of $125,774.00, of which $110,223.00 is attributed to sales of the product Zincite B. The exceptions to the referee's report relate to certain charges he made to sales. The first is laboratory salaries. Carboline says a pro rata portion of laboratory salaries should not be allowed because it was Carboline which incurred such expense in developing formulae which were purloined. Its witness, Mr. Homer Sayad, also a certified public accountant, testified that laboratory expenses for research and development would not be included as a part of the cost of goods sold except as to the extent they relate to quality control work. If there is evidence as to laboratory quality control work on rehearing, the deduction should be limited to that amount.

Mr. Schorb determined that an account for sales of Zincite B due from the Swedish firm, Zinkoplast, in the amount of $19,500.00 was uncollectible, was a bad debt, and allowed it as a charge against Zincite B sales as "a general and administrative expense." Carboline does not concede that the Zinkoplast account was in fact a bad debt, but did allow it to reduce net sales of Zincite B. Apparently this was done under a percentage allocation of lumped manufacturing expenses and adjusted by the ratio of such expenses to the total sales. The result, according to Carboline's computation, is some $6,000.00 less deduction for this item in manufacturing expenses than the referee reported. It would seem that if the Zinkoplast account for the purchase of Zincite B is uncollectible in whole or in part (as may appear on rehearing), if the account was included in gross sales, it should be allowed as a direct deduction from profits received by Plas-Chem from the sale of Zincite B.

Outside labor charges of $6,985.00 were incurred by Plas-Chem in repainting barges upon which one application of Zincite B had failed. The referee charged this labor expense directly against Zincite B sales (as did Plas-Chem in its books as a part of the cost of production of that product). Other manufacturing expenses were prorated for the reason that no specific allocation to a product could be made. Carboline computed this deduction in its "recast" manufacturing expenses on the basis of ratio thereof to total sales, as well as other manufacturing expenses. It is obvious that this method results in a loss to Plas-Chem of direct deductions in full amounts of items which are directly traceable to the production and sale of enjoined products.

There is merit in Mr. Sayad's "incremental cost accounting" or "incremental profit method" of ascertaining Plas-Chem's profits from sale of enjoined products. According to him, "where a product is added to a line of products, that the profit contribution of that new product is generally determined by what is called the incremental profit method. Briefly, the incremental profit method means that no costs which the organization is already saddled with, no fixed costs which the organization is already saddled with should be allocated to the new product. This is a widely-accepted theory that's used in management, by management, and in introducing new products, and I believe it would be the proper method to be followed here, also." "Q. In other words, only those expenses which increased because of the new product line should be allocated to general and administrative expenses? A. In the area of general and administrative expenses, general and administrative expenses are, of themselves, of an overhead type, they are considered to be on-going expenses, as sometimes they are referred to. To the extent that such expenses were already on-going at the time the product was introduced, they should not be allocated to the new product, only the increase in such expenses that

can be related to the new product should be allocated to the new product."

A similar theory to that espoused by Mr. Sayad was applied in Societe Anonyme v. Western Distilling Company (Cir.Ct.Mo., E.D.), 46 F. 921, a trademark case, where it was found that the unlawful venture increased gross profits without swelling gross expenses. The court said, loc. cit. 922, "That while it is customary in the computation of profits in this class of cases to make allowance for expenses, yet the expenses so allowed must be expenses necessarily incurred in the unlawful venture, which would not have been incurred but for engaging in such venture." See also Carter Products, Inc. v. Colgate-Palmolive Company (D.C.Md.), 214 F.Supp. 383.

Apparently the referee found a total of $303,803.00 general and administrative expense, and on the basis of percentage of sales allocated $95,832.00 to enjoined products. Carboline computed the allocation at $22,995.00.

Plas-Chem gives as a definition of "incremental costs" that of its quoted work "Cost Accounting—Analysis and Control" by Gordon Shillinglaw as "the difference in total costs that would result from selecting one alternative or another." That definition does not differ in essence from that of Mr. Sayad that "only the increase in such expenses that can be related to the new product should be allocated to the new product," because an increase in expenses for production of the new product would result in a difference in total costs (before and after production of the new product). In any event, upon further proceedings, Plas-Chem may and should be given the opportunity to show as proper deductions those which directly relate to the production and sale of new (enjoined) products. The general and administrative expenses (officers' salaries, rent, utilities, insurance, travel, legal and accounting, etc.) in existence when Plas-Chem decided to produce the products should not be used to allocate costs proportionately to sales.

Upon rehearing the proper deductions, on a cost basis, may be ascertained as related to the new product and applied as to other elements of the referee's report: containers and labels; whether zinc dust was prepackaged in five-gallon containers, necessitating no allowance for the purchase of such containers; and whether the use of five-gallon containers was improperly computed as to their cost.

The judgment is reversed and the cause remanded with directions to enter a new judgment jointly and severally enjoining and restraining defendants (a) from manufacturing, using, selling, distributing, formulating for themselves or anyone else or having anyone else manufacture, formulate or compound for them: Chem Pon 2110 Primer, Chem Pon 2110 Finish; Chem Pon 2310 Primer, Chem Pon 2310 Gray Finish, Chem Pon 2310 Black Finish; Zincite B; Chem Mastic 2200 Aluminum, Chem Mastic 2200 Black, Chem Mastic 2201; and Chem Thane 2800 HD Primer, Chem Thane 2800 HD Build Coat, Chem Thane 2800 HD Finish Coat; (b) from soliciting or accepting orders for corrosion resistant and industrial coatings or related chemical materials compounded according to the formulations used in the preparation of the products listed in paragraph (a) immediately above; (c) from using, in any manner whatsoever, the plaintiff's formulae and know-how, as of November 30, 1960, employed in its manufacture of Epoxy 188 Primer and Finish; Phenoline 300 Orange, Phenoline 300 Finish, Phenoline 302 Black; Carbomastic 12, Carbomastic 5, Carbomastic 3; Titanate Base as used in the manufacture of zinc galvanic coatings; and Carboline 1302-3 Finish, Carboline 131 Build Coat; (d) from disclosing in any manner whatsoever the plaintiff's formulae and know-how for products listed in paragraph (c) immediately above, to any other person, firm or corporation. Such injunction shall be ordered either to be perpetual or limited in duration as the court shall find from further evidence adduced, if any, to be the time within which defendants with their staff as of November 30, 1960 could have by independent research discovered and produced plaintiff's said products. Further evidence shall be heard on plaintiff's damages for the misappropriation of trade secrets in its said products, in accordance with the foregoing accounting methods, and from evidence as to the amount of lawful deductions to which defendants are entitled from the gross profits realized from the sale of products listed in paragraph (a) above. Such damages shall likewise be limited to the time the court shall find to be that within which defendants could have produced plaintiff's products by independent research with their staff as of November 30, 1960.

BARRETT, C., not sitting.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.