599 F.2d 870
 13 ERC 1313
 Ruby YOUNG, Monroe Young, Kim Greene, Joseph Weaver, Georgia
Weaver, Ollie Green, Thomas Green, and Barbara
Bradshaw, Individually and on Behalf of
All Others Similarly Situated,
Appellants,
v.
Patricia HARRIS, Sued in her Official Capacity as Secretary
of the United States Department of Housing and Urban
Development, Pantheon Corporation, a corporation, Pershing
Redevelopment Corporation, a corporation, City of St. Louis,
a Body Corporate, John Young, Thelma Young, Richard Shelton,
Lipton Realty, Inc., a corporation, and the St. Louis
Housing Authority, a Municipal Corporation, Appellees.
 No. 78-1896.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 15, 1979.
Decided June 13, 1979.
Rehearing and Rehearing En Banc Denied July 6, 1979.
 
 Jim Eggleston, St. Louis, Mo., argued, Arlene Zarembka, Legal Service of Eastern Missouri, St. Louis, Mo. and Margaret Zonia Morrison, Legal Service of Eastern Missouri, St. Louis, Mo., on brief, for appellants.
 Anne C. Travis, Asst. U. S. Atty., St. Louis, Mo., argued, Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief, for appellee, HUD, Patricia Harris.
 Charles A. Seigel, St. Louis, Mo., argued, Harvey A. Harris, Jeffrey H. Pass and Christopher M. Blanton, Stolar, Heitzmann & Eder, St. Louis, Mo., on brief, for appellees, Pantheon and Pershing.
 Michael E. Hughes, Asst. City Counselor, St. Louis, Mo., argued, Jack L. Koehr, City Counselor, St. Louis, Mo., on brief, for appellee, City of St. Louis.
 G. Carroll Stribling of Fordyce & Mayne, Clayton, Mo., for appellee, Richard Shelton.
 Charles W. Kunderer of Klutho, Cody & Kilo, St. Louis, Mo., argued, Edward C. Cody and Victor J. Klutho, St. Louis, Mo., on brief, for appellee, St. Louis Housing.
 Richard P. Sher of Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., filed brief, for appellee, Lipton Realty, Inc.
 Before GIBSON, Chief Judge, and ROSS and McMILLIAN, Circuit Judges.
 GIBSON, Chief Judge.
 
 
 1
 This is an appeal from the District Court's[1] denial of appellants' motion for a preliminary injunction restraining appellees from continuing the redevelopment of the Pershing-Waterman area of St. Louis, Missouri. Jurisdiction in this court rests upon 28 U.S.C. § 1292(a)(1).
 
 
 2
 * Appellants represent a class of persons who are present and former lower-income, predominantly black residents of the 106-acre redevelopment area in St. Louis, Missouri, known as the "Pershing-Waterman" area. Appellees represent various interests allegedly engaged in the project of redeveloping the Pershing-Waterman area.[2] Appellants filed their complaint on November 3, 1978, requesting declaratory, mandamus and injunctive relief because of alleged violations of three federal statutes,[3] the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 (URA), 42 U.S.C. §§ 4601 Et seq., the Housing and Community Development Act (HCDA), 42 U.S.C. §§ 5301 Et seq., and the National Environmental Policies Act (NEPA), 42 U.S.C. §§ 4321 Et seq. The complaint also requested a temporary restraining order restraining any interference with the tenancy and quiet enjoyment of the appellants still residing in the Pershing-Waterman area,[4] and prohibiting further demolishing of any dwelling units located within the area. The District Court immediately granted a temporary restraining order and scheduled a hearing on appellants' motion for a preliminary injunction for November 9, 1978, on which date the court dissolved the temporary restraining order.
 
 
 3
 Appellants alleged that they would suffer irreparable injury in the form of deprivation of housing if appellees were not enjoined from evicting persons in the redevelopment area; from discontinuing utilities, services, and maintenance of appellants' apartments; from demolishing any more buildings in the redevelopment area; from disbursing and expending federal Community Development Block Grant funds in the area; and from taking any further redevelopment actions incompatible with accommodating the housing needs of the people who have been or will be displaced as a result of the project. The District Court denied the request for a preliminary injunction on December 7, 1978. It found that appellants failed to show that they were likely to succeed on the merits of their claims regarding statutory violations and also concluded that "the harm done those plaintiffs who may be forced to move while this case is proceeding is considerable, but later legal and equitable relief will be adequate to restore their rights if they are found to have been displaced wrongly, without benefits."[5] The District Court denied appellants' request to enter an injunction pending appeal on December 12, 1978, and this court did likewise on December 29, 1978. We now affirm the order of the District Court denying a preliminary injunction.
 
 II
 
 4
 In April 1971 the City of St. Louis declared the Pershing-Waterman area to be blighted and designated it as a redevelopment area pursuant to the Missouri Urban Redevelopment Corporation Law, Mo.Rev.Stat. §§ 353.010, Et seq. (1969). Under the Urban Redevelopment Corporation Law, corporations organized according to the statute with a public purpose of redeveloping blighted areas[6] may be granted special privileges. These privileges include the power of eminent domain and property tax abatements on redeveloped property. Initially, two corporations, the Kingsbury Redevelopment Corporation and the Forest Village Redevelopment Corporation, were organized according to the Urban Redevelopment Corporation Law for the purpose of redeveloping the Pershing-Waterman area. The City of St. Louis approved the redevelopment plans submitted by them and granted both the power of eminent domain and property tax abatements. The redevelopment planned by these corporations, however, never materialized due to their inability to obtain financing.
 
 
 5
 Pantheon Corporation, a general business corporation, was incorporated on January 21, 1972, with Leon R. Stauss as the sole stockholder. In 1974, Pantheon formulated a coordinated redevelopment plan for the Pershing-Waterman area. Pursuant to this plan, it created the Pershing Redevelopment Corporation (developer) on May 30, 1975, a wholly-owned subsidiary incorporated as a Missouri Urban Redevelopment Corporation under Mo.Rev.Stat. Ch. 353, and acquired the stock of both the Kingsbury and Forest Village Corporations in May 1975 and February 1976, respectively. Pantheon also engaged in substantial efforts to obtain financing for its plan. As a part of this effort it arranged a multi-million dollar financing commitment from Mercantile Trust Company National Association in the form of a revolving credit agreement, subordinated debentures, and other loans. The redevelopment plan financing consists of wholly private capital, with the only aspect of federal assistance in the form of mortgage insurance by the Department of Housing and Urban Development (HUD).
 
 
 6
 On June 22, 1976, the Board of Alderman of the City of St. Louis approved Ordinance 57217, approving the redevelopment plan and setting forth an agreement between the developer and the city regarding the development. The agreement bestowed upon the developer all of the rights and benefits available under Mo.Rev.Stat. Ch. 353, and also provided for the city to undertake certain obligations with regard to the project. These obligations generally related to normal municipal services.[7]
 
 
 7
 The City of St. Louis has applied for and received substantial amounts of federal Community Development Block Grant (CDBG) funds, available under the Housing Community Development Act, 42 U.S.C. §§ 5301 Et seq. The city uses these funds, together with general revenues, to provide a variety of municipal services on a city-wide basis. In its annual applications for the CDBG funds, the city has indicated that portions of the funds would be used to provide services in the Pershing-Waterman area.[8] The city, however, contends that the approval of the applications does not commit it to apply the CDBG funds directly to its obligations with respect to the redevelopment project and that the funds are expended for services throughout the city. It is undisputed that the agreement between the developer and the city does not specify the source of funding for the municipal services to be provided.
 
 
 8
 Since the city's receipt of CDBG funds required it to comply with the requirements of NEPA regarding preparation of a statement assessing the environmental impact of their expenditure, 42 U.S.C. § 5304(h); 24 C.F.R. § 53.15, the city published a statement in August 1976 to the effect that an environmental impact statement was not required because the funded activities would not significantly affect the human environment. On January 11, 1977, following a fifteen-day time period for public comment and review, HUD approved the environmental certificate for release of funds. Although city funds have been used to provide usual and normal municipal services to the area, such as streets and sidewalks, all of the residential units and dwellings are privately owned; in addition, private funds are used exclusively in the rejuvenation program.
 
 III
 
 9
 In Dakota Wholesale Liquor, Inc., v. Minnesota, 584 F.2d 847, 848-49 (8th Cir. 1978), this court reviewed the law regarding the proper standard to be applied by a district court in determining whether a preliminary injunction should be ordered:
 
 
 10
 The traditional tests have been that the party seeking the injunction must prove that "(1) there is a substantial probability that it will succeed at trial on the merits of its claims and (2) it will suffer irreparable injury if injunctive relief is not forthcoming." Planned Parenthood, Inc. v. Citizens for Community Action, 558 F.2d 861, 866 (8th Cir. 1977). However, in Fennell v. Butler, 570 F.2d 263, 264 (8th Cir. 1978), this court directed the district court on remand to apply the preliminary injunction standards used in the Second Circuit. The Second Circuit has held that:
 
 
 11
 (A) preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits And possible irreparable injury, Or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation And a balance of hardships tipping decidedly toward the party requesting the preliminary relief.
 
 
 12
 Sonesta Int'l Hotels Corp. v. Wellington Assocs., 483 F.2d 247, 250 (2d Cir. 1973).
 
 
 13
 Also, we noted the limited nature of our scope of review. We cannot reverse unless we conclude that the district court abused its discretion. 584 F.2d at 849. See also Campbell "66" Express, Inc. v. Rundd, 597 F.2d 125 (8th Cir. 1979). Since this court has not acted En banc on this modification of the traditional test, we express no opinion as to whether or not it should be applied in this case. Suffice it to say that we have concluded that the trial court did not err under either test.
 
 
 14
 In making this determination we have considered the probability of success at trial and the seriousness of questions going to the merits in the application of three federal statutes. We address them Seriatim.
 
 IV
 
 15
 The District Court held that it was unlikely that the appellants could prove that they were entitled to federal relocation benefits under the URA. It found that the developers' redevelopment corporations are private entities under Missouri law, and that there was no evidence of federal aid within the meaning of the URA.
 
 
 16
 Section 4625(a) of the URA provides in relevant part:
 
 
 17
 (a) Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall provide a relocation assistance advisory program for displaced persons which shall offer the services described in subsection (c) of this section.
 
 
 18
 Section 4601(6) of the URA defines the term "displaced person" as:
 
 
 19
 any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a Program or project undertaken by a Federal agency, or with Federal financial assistance; * * *. (Emphasis added.)
 
 
 20
 The developer does not claim to have provided relocation assistance as required by the URA. It argues that the URA does not apply to its redevelopment activities in the Pershing-Waterman area because appellants are not "displaced persons" because it acquired real property solely in its capacity as a private developer and without federal financial assistance.[9]
 
 
 21
 It is the established law in this circuit that the URA definition of "program or project undertaken by a Federal agency, or with Federal financial assistance" does not encompass the situation when a private party undertakes a federally assisted program or project and acquires property. Moorer v. Department of Housing and Urban Development, 561 F.2d 175 (8th Cir. 1977), Cert. denied, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978); See also Alexander v. United States Department of Housing and Urban Development, --- U.S. ----, ---- n.9, 99 S.Ct. 1572 n.9, 60 L.Ed.2d 28 n.9 (1979); Conway v. Harris, 586 F.2d 1137 (7th Cir. 1978); Parlane Sportswear Co. v. Weinberger, 513 F.2d 835 (1st Cir.), Cert. denied, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975). Thus the URA would not apply to the Pershing-Waterman redevelopment project if it were found that the project had been undertaken by a private party as opposed to a federal, state, or local governmental agency, or in the alternative, if it were found that the project had not received federal financial assistance. Resolution of both these issues depends upon whether the appellants' characterization of the project as a joint undertaking in the nature of a partnership between the private developer and the City of St. Louis accurately portrays the organization of the project. We find that the evidence is clearly inadequate to establish that the activities of the City of St. Louis and the private developer are sufficiently intertwined to characterize them as one project undertaken by a state instrumentality.
 
 
 22
 The primary sources of the developer's relationship with the City of St. Louis are Mo.Rev.Stat. Ch. 353 and City of St. Louis Ordinance 57217. These give the developer special privileges such as the power of eminent domain and tax abatements, and the City of St. Louis has pledged certain assistance to the developer's project. This assistance has taken various forms. The City has demolished nine vacant buildings, has provided various street improvements, and has sold land to the developer at extremely low cost by virtue of tax foreclosure sales. At the same time, the developer is a privately-held corporation. It was organized and is controlled by private interests, and has arranged to finance its project from wholly private sources. On this evidence, we cannot say that the assistance provided by the city because of its desire to encourage and promote private redevelopment of blighted areas is sufficient to deprive the developer's project of its status as a private project; a contrary holding is clearly indicated.
 
 
 23
 The cases cited by appellant dealing with state action under the fourteenth amendment are inapposite because they do not reflect congressional intent regarding the URA. The URA defines a state agency as "any department, agency, or instrumentality of a State or of a political subdivision of a State, * * *." 42 U.S.C. § 4601(3). The House Report on the URA stated that this definition was "self-explanatory." H.R.Rep.No.91-1656, 91st Cong., 2d Sess., Reprinted in (1970) U.S.Code Cong. & Admin.News, pp. 5852-53. The creation of urban redevelopment corporations has not been interpreted as the conversion of private resources into a governmental entity. The states have enlisted the aid of private enterprise to combat urban blight, but have not sought to change the status of these corporations from privately owned, profit-motivated enterprises. See Berman v. Parker, 348 U.S. 26, 33-34, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (acquisition by federal agency, but redevelopment by private enterprise); Council Plaza Redevelopment Corp. v. Duffey, 439 S.W.2d 526, 528 (Mo.1969); Annbar Associates v. West Side Redevelopment Corp., 397 S.W.2d 635, 643 (Mo.1965), Appeal dismissed, 385 U.S. 5, 87 S.Ct. 41, 17 L.Ed.2d 4 (1966); Mo.Rev.Stat. § 610.010(2) (1979 Supp.).
 
 
 24
 Although, in Moorer v. Department of Housing and Urban Development, supra at 183, we addressed the application of the URA in terms of whether the real property had been acquired "by a government entity with the power of eminent domain," this did not imply that the mere grant of the power of eminent domain created a governmental entity. Although the grant of the power of eminent domain in some circumstances might indicate the existence of a state instrumentality within the meaning of the URA, we conclude that the other factors reflecting the private nature of the redevelopment project outweigh the significance of the mere grant of the power in this case. There is no evidence that the developer used its eminent domain power to cause any displacements. Historically, the power of eminent domain has been granted by legislative enactment to private corporations, of which railroads and private utilities are prime examples. This grant does not transform these private corporations into governmental entities or instrumentalities of the state.
 
 
 25
 We agree with the District Court that the evidence indicates that both the Pantheon and Pershing Redevelopment corporations should be considered private entities. Thus, acquisitions of property by these corporations in furtherance of their redevelopment project would not be within the scope of the URA.
 
 
 26
 Whether the project has received federal financial assistance depends upon an evaluation of the city's use of the Community Development Block Grant funds.[10] Since we have already concluded that the city's agreement with the developer clearly did not render the developer's project a joint undertaking, financial assistance for municipal services cannot necessarily be equated with financial assistance to the private redevelopment project. This is especially true if the city was not required directly to apply or channel the Community Development Block Grant funds to the municipal services it provided in the Pershing-Waterman area. In any event, federal financial assistance to a private project is insufficient to bring the project into the realm of the URA. See Conway v. Harris, supra; Parlane Sportswear Co. v. Weinberger, supra.
 
 V
 
 27
 Appellants also alleged the city's failure to comply with Community Development Block Grant application requirements as a basis for the preliminary injunction. Title 42 U.S.C., section 5304(a) requires that Community Development Block Grant applications contain a housing assistance plan, and the 1977 congressional amendments added that this plan must include "provision of a reasonable opportunity for tenants displaced as a result of (restoration and rehabilitation) activities to relocate in their immediate neighborhood, * * *." 42 U.S.C. § 5304(a)(4)(C). The District Court determined that this requirement did not apply to the Community Development Block Grant funds currently available to the city, because HUD provided that the implementing regulations were effective as of August 1, 1978. 24 C.F.R. § 570.300(b)(4). We do not address the issue of the effective date of this requirement because it is unlikely that appellants could succeed on the merits of their claim, assuming that the requirement applied to the city's 1978 application. The discussion regarding the application of the URA reveals that the privately designed and implemented Pershing-Waterman redevelopment plan cannot be viewed as a project of the City of St. Louis. Thus the city would not be required to meet the provisions of 42 U.S.C. § 5304(a)(4)(C) in order to be eligible for the Community Development Block Grant funds it has received to provide municipal services in the Pershing-Waterman area. The city's efforts to improve this area can be viewed as separate from the activities of the private developer.
 
 VI
 
 28
 Appellants' allegation concerning the violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 Et seq., relies upon the city's failure to include the actions of the private developer in the city's environmental assessment of its use of the Community Development Block Grant funds. The Housing Community Development Act, 42 U.S.C. § 5304(h), requires applicants for Community Development Block Grant funds to comply with NEPA, and HUD's regulations place the responsibility for this compliance upon the applicant. 24 C.F.R. § 58.15(a). In 1976, the city prepared its environmental assessment of its Community Block Grant-assisted activities, and concluded that they did not constitute action which would significantly affect the human environment. The city did not assess the separate activities of the private developer in the Pershing-Waterman area. Our previous conclusion, that the city was not a partner to these activities, controls the issue of whether this failure would constitute a violation of NEPA. Since the redevelopment activities were not designed by the city, and were implemented by private parties, it was reasonable not to include them in the environmental assessment. See Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314, 1320 (8th Cir. 1974). The assessment is not challenged on any other basis.
 
 VII
 
 29
 The District Court also determined that the preliminary injunction should not be granted because it was not necessary to avert irreparable harm, and because the possibility of injury to the public and to the appellees would be greater than any injury suffered by appellants. These findings alone are a sufficient basis for the denial of a preliminary injunction. In its determination, the District Court also considered the potential impact of a preliminary injunction upon the public welfare. In Minnesota Bearing Co. v. White Motor Corp., 470 F.2d 1323, 1326 (8th Cir. 1973), this court stated:
 
 
 30
 Other factors which may be considered in the decision to grant or to deny the request are the absence of substantial harm to other interested parties, and the absence of harm to the public interest. See 3 B & H, Federal Practice and Procedure § 1433 at 490-493 (Wright Ed. 1958); Accord, Winkleman v. New York Stock Exchange, 445 F.2d 786, 789 (3rd Cir. 1971).
 
 
 31
 The requested injunction might have severely constricted the availability of future private financing for sorely needed, private urban redevelopment efforts.
 
 
 32
 It was also appropriate to take into consideration that although the redevelopment project formally commenced activity in June of 1976, appellants delayed until November of 1978 to seek relief. Some phases of the redevelopment plan have already been completed[11] and the potential injury to appellants from the activities proposed by the plan in the near future does not appear to be great.
 
 VIII
 
 33
 We conclude that the District Court did not abuse its discretion in failing to issue the requested preliminary injunction. Appellants failed clearly to prove violations of the three federal statutes at issue or that they would suffer irreparable harm if the appellees were allowed to continue their activities. Because of this holding, we do not address the other issues raised by some of the appellees.
 
 
 34
 Judgment affirmed.
 
 
 35
 McMILLIAN, Circuit Judge, concurring.
 
 
 36
 While I concur in the result for the legal reasons discussed by the majority, I am saddened by the expediency and callousness exhibited by this rehabilitation scheme toward the original residents of the neighborhood. The federal, state and local governments' attempts to garnish the assistance of private developers in rebuilding the inner cities is laudable. The dislocation of lower income families as exhibited in this case reveals, however, the shortsightedness in most urban redevelopment planning which, rather than alleviating the inner city ghetto, will merely cause it to geographically shift. As the majority discussed, the legislative history of the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 (URA), 42 U.S.C. §§ 4601 Et seq., indicates that Congress did not intend this Act to apply to relocations effectuated by private developers, even though these developers may be assisted financially by the federal government. In light of the recent trend in government programs of enticing private enterprise to undertake endeavors once assumed solely by the governmental entities, I question whether the original scope of the URA is still appropriate.
 
 
 
 [1]
 The Honorable James H. Meredith, Chief Judge, United States District Court for the Eastern District of Missouri
 
 
 [2]
 It would appear, however, that several of the appellees have only a tenuous connection with the redevelopment project and are not appropriate parties in this lawsuit. No relief is requested against the individual private owners of property, and the St. Louis Housing Authority has no present or future possessory interest in the development area and has had no involvement with the redevelopment project
 
 
 [3]
 Appellants' complaint also alleged violations of ordinances of the City of St. Louis, Nos. 56125, 56126, 56127, and 57217, the Missouri Relocation Assistance Act, Mo.Rev.Stat. §§ 523.200 Et seq., and the Federal Civil Rights Act, 42 U.S.C. §§ 2000d Et seq., but they have not raised these arguments on appeal
 
 
 [4]
 The 106-acre area previously had a relatively high concentration of residential dwellings, but many persons left the area because of its deteriorating condition and high crime rate. Many of the buildings were abandoned, vacant, and vandalized. Prior to the present developer's activity, the area had degenerated to the point that only 500 dwelling units remained occupied. The current plan of development calls for over 2,000 completely rehabilitated and new units, with § 8 HUD subsidies available for twenty percent of the rental units. The plan envisions a racially, socially, and economically integrated neighborhood
 
 
 [5]
 The District Court noted that the appellants failed to post a bond securing against losses as required by Fed.R.Civ.P. 65, but we do not rely upon this as a basis for upholding the denial of a preliminary injunction. Because of our evaluation of the other issues, we need not determine if specific equitable or legal considerations in this case might require that the bond be waived or set at a nominal amount. The record fails to show the number of families adversely affected by the rehabilitation program. There is evidence indicating only about 150 families are left in the area, and according to the private developers, only three families will be involuntarily displaced as a result of the developers' future activities
 
 
 [6]
 Mo.Rev.Stat. § 353.030 provides in relevant part:
 The articles of agreement or association shall be prepared, subscribed and acknowledged, and filed in the office of the secretary of state pursuant to the general corporations laws of the state and shall contain: * * * (11) a declaration that the corporation has been organized to serve (the) public purpose; that all real estate acquired by it and all structures erected by it are to be acquired for the purpose of promoting the public health, safety and welfare, * * *.
 
 
 [7]
 City of St. Louis Ordinance 57217 provides in relevant part:
 
 
 [10]
 The City agrees to cooperate with Developer and with due diligence to join with the Developer in procuring all changes, improvements and additions in municipal services respecting the Development Area consistent with the Development Plan deemed necessary by the City and the Developer, including but not limited to the following items which it is hereby expressly agreed are deemed necessary by the City and Developer:
 (a) The City will, at Developer's request, promptly effect the vacation, opening and closing (temporary and permanent) of streets, alleys, and cul-de-sacs as provided for in the Development Plan, and will promptly pay the cost of land acquisition necessary for opening or widening of streets, alleys and cul-de-sacs.
 (b) The City will cause its several agencies to cooperate with the Developer in land assemblage and, particularly with respect to acquisition of parcels held or acquired by Land Reutilization Authority.
 (c) The City will cooperate in the rezoning of property as provided for in the Development Plan, and in the approval of applications for Community Unit Plans, for Planned Residential Developments, * * * other unit or block development.
 (d) The City will perform all necessary demolition work within the Development Area at its own expense.
 (e) The City will aid through its Department of Welfare in the relocation process.
 (f) The City will, at its cost, perform all necessary improvements to all existing streets which remain as part of the final development. These improvements to include widening, narrowing, resurfacing, curb and gutter repair, sidewalk installation and repair, street lighting and signal changes, median installations, planting strip areas, and cul-de-sac and turn around installations as determined by the approved street pattern configuration.
 (g) The City will, at its cost, provide public park improvements for those areas so designated by the approved Development Plan.
 (h) The City will take all other necessary and proper steps to insure that adequate municipal services consistent with the development of the area will be rendered to the Development Area.
 All of the foregoing shall be accomplished in order to permit the timely development of each stage of the development in accordance with the schedules established in the Development Plan and shall constitute a condition precedent to Developer's obligation to proceed, failure of which condition shall be deemed a cause of delay beyond Developer's reasonable control.
 
 
 [8]
 The "Year II" application for funding for April 1 through December 31, 1976, did not directly request funds in support of the Pershing-Waterman project, but the "Year III" application for 1977 requested $374,000 in block grant funds for the area, stating:
 The City of St. Louis will initiate public improvements in support of the Pershing Redevelopment Corporation under the Missouri Urban Redevelopment Corporation Law (Chapter 353 R.S.Mo.). The approved redevelopment plan requires extensive reconstruction and improvements on DeBaliviere Avenue, to include sidewalk and curb construction, median construction, landscaping, fixture adjustments and relocation, and planting. The improvements will be administered by the Land Clearance Authority.
 It also requested $650,000 to fund the city's Land Clearance Authority, stating in part:
 The Authority will assume administrative responsibilities for the Lafayette Towne, Lucas Heights, and Pershing-Waterman Redevelopment projects.
 The city's 1978 application continued the request for funds to support the project, but increased the requested amount to $503,000, stating:
 The City of St. Louis will continue to fund public improvements in support of the Pershing Land Corporation under the Missouri Urban Redevelopment Corporations Law (Chapter 353). The approved redevelopment plan requires extensive reconstruction and modification of Pershing, Waterman, Clara and Belt. Improvements to be administered by the Land Clearance Authority will include strict resurfacing, curb and sidewalk and cul-de-sac construction.
 The application also requested funding for code enforcement and demolition services that may have benefited the redevelopment project.
 
 
 [9]
 As noted in footnote 4, the deteriorated condition of the housing caused the bulk of the residential displacements that have occurred in the Pershing-Waterman area. This displacement took place before 1976, when Pantheon commenced its redevelopment program. The URA would not apply to these displacements because they did not directly result from an actual or proposed acquisition of property for a governmental program or project. Also, some of the displacements directly at issue in this suit likewise fail to meet the requirement that they result from acquisition of the property because they have been caused by the rehabilitation of property by its present owner. The rehabilitation efforts of the private property owner, Richard Sheldon, exemplify this situation, where any displacement is unrelated to an acquisition of property for a governmental program or project. The United States Supreme Court, in Alexander v. United States Department of Housing and Urban Development, --- U.S. ----, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979), recently explained that Congress intentionally restricted the definition of a "displaced person" to the context of a property acquisition for a program or project. See also Blount v. Harris, 593 F.2d 336 (8th Cir. 1979)
 
 
 [10]
 Although project funds were backed by federal mortgage insurance from HUD, the URA specifically exempts this from its definition of "federal financial assistance." 42 U.S.C. § 4601(4)
 
 
 [11]
 One hundred forty-six apartments have been completely restored and forty-six condominiums remodeled