479 F.Supp. 164 (1979)
NEIL AND SPENCER HOLDINGS LIMITED, Plaintiff,
v.
KLEEN-RITE, INC., Defendant.
No. 79-667-C(3).
United States District Court, E. D. Missouri, E. D.
September 6, 1979.
*165 Ralph W. Kalish, Peter S. Gilster, St. Louis, Mo., for plaintiff.
Lionel L. Lucchesi, Polster, Polster & Lucchesi, St. Louis, Mo., for defendant.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court on plaintiff's prayer for a preliminary injunction in its diversity action against defendant for unfair competition, breach of contract, violation of a confidential relationship, and fraud. A five-day hearing was held in open court on plaintiff's request for preliminary injunctive relief. Plaintiff's motion for a temporary restraining order has been denied by this Court.

FINDINGS OF FACT
1. Plaintiff, Neil and Spencer Holdings Limited (hereinafter Neil and Spencer), is a corporation organized and existing under the laws of the United Kingdom and has its principal office and place of business at Station Road, Leatherhead, Surrey, England.
2. Defendant, Kleen-Rite, Inc. (hereinafter Kleen-Rite), is a corporation organized and existing under the laws of the State of *166 Wisconsin and has its principal office and place of business at 4444 Gustine Avenue, St. Louis, Missouri.
3. Both plaintiff Neil and Spencer and defendant Kleen-Rite are engaged in the manufacture and sale of a variety of dry cleaning equipment.
4. Plaintiff's exclusive manufacturer's agent in the United States is Spencer America Manufacturers, Inc. (hereinafter Spencer America), a New York corporation. Spencer America also represents manufacturers other than plaintiff. Since March, 1978, Spencer America's offices and place of business have been in St. Louis, Missouri.
5. Plaintiff holds a majority interest in Spencer America.
6. Plaintiff and defendant have had a business relationship since 1974, when they entered into a secrecy agreement concerning technical information, relating to a solvent filtration system, which defendant was to provide plaintiff. Defendant subsequently licensed plaintiff to manufacture the filtration equipment.
7. On April 30, 1974, U.S. Patent 3,807,948 was granted to plaintiff on a refrigerated solvent recovery system for use with dry cleaning machines; application had been made for the U.S. patent in 1972 and for British patents in 1971.
8. In 1976, an apparatus of the type described in the patent was put on exhibit by plaintiff at a trade fair in Birmingham, England. John Wolfe, who was then and until May 24, 1979, an officer and director of defendant, saw and took an interest in the apparatus, called a Resolver. At the same trade fair, Robert Smith, also an officer of defendant, talked with a representative of the German company Citex about a solvent reclaimer which Citex was developing.
9. After preliminary contacts, plaintiff and defendant entered into a "Secrecy Agreement" dated November 3, 1977. Under the Agreement, plaintiff was to provide certain manufacturing and cost data to defendant to enable defendant to determine whether it would be feasible to manufacture the Resolver in the United States under license from plaintiff. The Agreement bound defendant to handle "in a strictly confidential manner all the technical information" to be supplied. It also bound defendant to use the information only for the purpose stated.
10. The Agreement was signed for defendant by John Wolfe and for plaintiff by Stephen Proctor, plaintiff's Managing Director.
11. The Agreement nowhere described the Resolver apparatus itself as secret or confidential, nor did it prohibit the defendant from showing the Resolver to third parties.
12. After February or March, 1977, and prior to November, 1977, plaintiff had sold 20 to 50 Resolvers in England, and had sold one Resolver, to a party other than defendant, in the United States.
13. By letter dated November 3, 1977, defendant entered its order to plaintiff for two Resolver units. Defendant paid $4,696.00, which was plaintiff's cost, for both units. The Resolvers arrived in defendant's St. Louis office in March, 1978. Defendant installed one at a St. Louis area cleaners the same month for testing purposes.
14. From time to time during the period from November, 1977, to June, 1978, plaintiff did provide defendant with information consisting of sets of drawings and manufacturing specifications, wiring diagrams, and cost data on the Resolver. Plaintiff also responded to specific inquiries from defendant about the operation of the apparatus.
15. Subsequent to the delivery of the two Neil and Spencer Resolver units to defendant in St. Louis, Kleen-Rite undertook an evaluation of the units and their potential market in the United States. Kleen-Rite's initial analysis indicated that the Resolvers were not, as manufactured by Neil and Spencer, suitable for use by United States dry cleaners.
16. A key feature of the Resolver unit is the use of a bed of rock chips, in which the coils of a refrigeration system are embedded. *167 The operation of the Resolver involves one period during which heat is removed from the rocks through the cooling coil, and another period during which heated solvent-laden air is circulated through the rock bed for the purpose of condensing the solvent.
17. Among the items of information which plaintiff conveyed to defendant was the fact that Neil and Spencer had experimented with a standard, finned refrigeration coil as the heat exchange medium, but that the finned coil iced up during operation and was not economical.
18. The unit installed by defendant in the St. Louis area cleaners malfunctioned in April, 1978, and John Wolfe called Air Masters Corporation, an air conditioning service, to request that a serviceman be sent to repair the unit. Clifford Schaefer was sent in response to Mr. Wolfe's request. He repaired several leaks and corrected the pressure setting on the unit.
19. Mr. Schaefer was called on two other occasions, later in April, to repair the unit. He was told on the first of these occasions that it was necessary to maintain a temperature of -20° C in the coils. He again determined that the prescribed pressure settings were too low. On hearing that the rock bed made the Resolver undesirably heavy, he suggested that an A-frame unit could be designed to provide the same function as that of the Resolver.
20. Mr. Schaefer was engaged by Mr. Wolfe to design and construct a unit which would work well with American dry cleaning machines and which would retail in the $2,000-$2,500 range to be competitive with the Hoyt "Sniff-O-Miser," which retails for $2,300-$2,700. Mr. Schaefer proceeded on the basis of his observation and measurement of the Resolver components, his experience with air conditioning equipment, his conversations with an independent chemist about the solvent perchloroethylene ("perc"), and by trial and error. He was not shown any of plaintiff's drawings or given any other confidential information.
21. Mr. Schaefer used only conventional refrigeration design and shop knowledge in designing the unit for Kleen-Rite. Only standard, "off-the-shelf" components were used in its construction.
22. Mr. Schaefer provided certain dimensions to Robert Smith, who built a cabinet for the components specified by Mr. Schaefer. In about May, 1978, Mr. Schaefer constructed one unit in his spare time in four weeks at defendant's plant and a second unit later at his home. Also in May, Mr. Wolfe reported to Mr. Smith that the Citex Company had informed him that -6° F (-20° C) was the optimum coil temperature for "perc" condensation.
23. The differences between the Vapor Condenser, designed by Mr. Schaefer, and plaintiff's Resolver, include the Vapor Condenser's use of two A-frame aluminum coils rather than a Monel coil embedded in rock chips, the use of a different refrigerant, and the use of 1½ h. p. rather than ¾ h. p.
24. In August, 1978, defendant notified plaintiff, in response to plaintiff's inquiry, that it was not then interested in manufacturing the Resolver in the United States, due to a fall in the price of the solvent "perc".
25. In October, 1978, however, defendant expressed renewed interest to plaintiff; the terms of a proposed licensing agreement were set forth at a meeting on November 29, 1978, in England, between John Wolfe and Stephen Proctor. The proposal was embodied in a document drawn up by plaintiff and dated December 4, 1978.
26. The proposal provided that Kleen-Rite would have "exclusive rights" for five years to manufacture and sell the Resolver in the United States and Canada. However, the proposal also included a reservation by Neil and Spencer of the right to sell Resolvers through Spencer America. The royalties contemplated in the proposal were the following: Year 1 8% of sales, Year 2 6%, and Years 3-5, 4½%. There was also a stated minimum royalty. Kleen-Rite was reluctant to sign the agreement immediately because half of the first year's minimum royalty was to be paid on signing.
27. The proposed licensing agreement remained unsigned.
*168 28. On January 2, 1979, the Environmental Protection Agency released a set of proposed rules relating to the emissions of hydro-carbons from dry cleaning establishments. These proposed rules suggested that the use of solvent recovery equipment might be required of dry cleaning establishments.
29. In February, 1979, Spencer America began to take orders for the Resolver in America; plaintiff began to ship Resolvers from the United Kingdom to the United States to fill the orders.
30. On March 14, 1979, Neil and Spencer informed Kleen-Rite that the proposal of December 4, 1978 was withdrawn. Neil and Spencer did indicate, however, that the matter could be reopened if Kleen-Rite still had any interest in the Resolver.
31. On March 14, 1979, Kleen-Rite sent a telex to Neil and Spencer expressing Kleen-Rite's continuing interest in a license from Neil and Spencer.
32. Subsequent negotiations for a license were handled for plaintiff by John Sasina, who had left the employ of Kleen-Rite/Arundale, Inc., as defendant was then known, in July, 1977, and who had become President of Spencer America in January, 1978.
33. On March 27, 1979, Kleen-Rite indicated in a letter to John Sasina that it would accept all the provisions of the December 4, 1978 proposal, including the royalty provisions, except for: the description of the license as "exclusive", the minimum royalty provisions, and the requirement that Kleen-Rite defend plaintiff's United States patent against infringement.
34. By a letter dated March 29, 1978, Mr. Sasina indicated Neil and Spencer's willingness to negotiate for a new license proposal which would reflect "the dramatically changing marketing factors for the Resolver product line". At a meeting on April 11, 1979, Mr. Sasina proposed a royalty rate of 15% of distributor price.
35. Defendant announced its solvent recovery system, the Vapor Condenser, to its distributors on April 26, 1979.
36. By a letter dated April 27, 1979, John Sasina indicated to defendant that a 12% royalty rate with no minimum might be acceptable.
37. Defendant's Vapor Condenser retails from $2,995, depending on the model, and plaintiff's Resolver retails in the United States for $4,500-$5,100, depending on the model.
38. Plaintiff observed normal security measures with respect to the development of the Resolver; access was restricted to authorized personnel.

CONCLUSIONS OF LAW
This matter is within the Court's jurisdiction by virtue of Title 28 U.S.C. § 1332.
The Court of Appeals for the Eighth Circuit has recently indicated that, on some occasions at least, the proper standard to apply in ruling on a motion for a preliminary injunction is that which has been used traditionally in the Second Circuit. Fennell v. Butler, 570 F.2d 263 (8th Cir. 1978); Dakota Wholesale Liquor, Inc. v. Minnesota, 584 F.2d 847 (8th Cir. 1978). However, in Young v. Harris, 599 F.2d 870 (8th Cir. 1979) a three-judge panel noted that since the Eighth Circuit had not yet acted en banc to modify the traditional test, the panel would express no opinion on which test was proper in the case before it. Id. at 876. The court in Young upheld the district court's ruling on either test.
The traditional requirements for the availability of a preliminary injunction in the Eighth Circuit are paired with a less stringent, alternative test in the Second Circuit's formulation:
(A) preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits and possible irreparable injury, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.
Young v. Harris, supra, at 875-876, [quoting Sonesta Int'l Hotels Corp. v. Wellington *169 Assocs., 483 F.2d 247, 250 (2d Cir. 1973)]. The Court finds that under either test, a preliminary injunction must be denied in the case at bar.
Denial of preliminary relief in the instant case is most obviously required by the plaintiff's failure to meet the second branch of either of the Second Circuit's tests. No reason appears why damages could not make Neil and Spencer whole. Spencer America, which is not the plaintiff in this action, may suffer injury due to its loss of revenues from the diminishment of its sales of Resolvers; this loss to Spencer America may remain uncompensated, but the plaintiff itself could be compensated entirely for any interim losses. The Second Circuit has held that the dampening of sales allegedly resulting from competition in violation of an exclusive licensing agreement is not the kind of injury which justifies the grant of preliminary injunctive relief. Foundry Services v. Beneflux Corporation, 206 F.2d 214 (2d Cir. 1953).
Similarly, it is not apparent that the balance of hardships tips "decidedly" toward Neil and Spencer. Neil and Spencer and Kleen-Rite are roughly equally situated with respect to the introduction of their units on the American market. Neil and Spencer, which has annual sales of $18-20 million, would presumably be less damaged by loss of Resolver royalties than Kleen-Rite, with annual sales of approximately $2 million, would be damaged by loss of profits from its Vapor Condensers.
This action is governed by the law of Missouri. Defendant has its principal place of business in the State; the Resolvers and technical information were shipped to defendant in St. Louis; and the alleged wrong, the development by defendant of its Vapor Condenser, occurred in Missouri. Missouri has a more significant relation with the events in dispute than does any other State.
We consider first the plaintiff's counts of unfair competition and breach of confidential relationship. Both are comprehended within the Restatement provision which has had widespread application in trade secret cases, section 757. The Restatement offers general Comments in an effort to describe a trade secret but it acknowledges that an exact definition is not possible.

b. Definition of trade secret. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers . . .

Secrecy. The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret . . . [A] substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
Restatement of Torts, § 757, Comment b.
We turn to recent Missouri cases for the Missouri courts' interpretation of trade secret law. In Reddi-Wip, Inc. v. Lemay Valve Company, 354 S.W.2d 913 (Mo.App. 1962) the elements of the cause of action for breach of confidence through misappropriation of trade secrets were described as the following: "(1) the existence of a trade *170 secret, (2) communicated to the defendant, (3) while he was in a position of trust and confidence, and (4) use by the defendant to the injury of the plaintiff." Id. at 917. The court, focusing its attention on the first element, held that since plaintiff's valve designs had been revealed in two patents issued five and two years, respectively, before the defendant, organized by one of plaintiff's former employees, began to market its own valves, there were no protectible trade secrets. Moreover, the court noted, the confidential relationship had ended in July, 1954 at the latest, and defendant did not begin development of its valves until 1956, nor did the defendant market its valves until May, 1957. The court reversed the trial court's decree enjoining the defendants from manufacturing all valves similar to those described in plaintiff's patents.
The Missouri Supreme Court dealt with the law of trade secrets in National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 152 U.S.P.Q. 120 (Mo.1966). That case involved a group of employees who had, while in plaintiff's employ, entered into a written agreement to form a new corporation to compete with plaintiff's manufacturing business. They had also set up a shop for copying the plaintiff's slug rejectors and coin changers. Plaintiff sued its former employees, alleging misappropriation of trade secrets. The alleged trade secrets included the physical features, such as dimensions and materials, of the parts of the devices, and the "trial and error" and experimentation that had gone into the development of the devices. The plaintiff disclaimed, however, a protectible interest in any of the information revealed in its patents or in the mountings which accompanied the machines, and it acknowledged that its devices could be measured by one skilled in measurement.
The Missouri Supreme Court observed that under the Restatement definition of trade secret, the fact that National had engaged in extensive experimentation prior to producing its devices was only one factor to be considered in determining whether National had trade secrets. The Court found that some of the alleged trade secrets were obvious in the finished products, and others were revealed in the mountings and in the production drawings which National sent to many of its customers on their request. Therefore, the Court held that there were no trade secrets involved.
The Court in National Rejectors did find that there had been a misuse of some of plaintiff's mainplates and blueprints, which had been brought to defendant's shop. However, the Court observed that none of defendant's drawings had been shown to be the result of "systematic copying" of plaintiff's drawings. Since the Court could not preclude the possibility that some dimensions had been taken directly from the plaintiff's drawings, it ordered that on remand, evidence was to be taken which would establish the profits plaintiff had lost through defendant's accelerated entry into the market.
In a more recent Missouri Supreme Court decision, Carboline Co. v. Jarboe, 454 S.W.2d 540, 165 U.S.P.Q. 521 (Mo.1970), the Court enunciated stringent standards for recovery in the field of trade secrets, especially with respect to proof of the element of use of the confidential information. In Carboline, the defendant employed a chemist who had worked for plaintiff for five years and who had, in the course of his earlier employment, signed a Secrecy Agreement regarding processes and methods he might become familiar with while in plaintiff's employ. Plaintiff charged that the defendant had misappropriated this confidential information by using it, through the chemist, to develop its own products.
The proof, with respect to many of the products, was characterized by the court as "circumstantial"; it included the chemist's earlier access to plaintiff's lab data, the relative speeds with which plaintiff and defendant had developed the products, and the similarity of the products. Id. 454 S.W.2d 540, 165 U.S.P.Q. at 524. The court held that, although the evidence showed that plaintiff did have trade secrets to *171 which the chemist had access, the burden of proof was on the plaintiff to show that the defendant had actually used the secrets acquired by the chemist in its own products. The proof had to be such as to establish identity of chemical formulae. Id. 454 S.W.2d 540, 165 U.S.P.Q. at 527-28. The court noted that this was especially necessary in view of the fact that defendant's president was himself an experienced chemist; it noted that the defendant should not be prevented from using its own "properly developed business".
This Court has reviewed the above cases carefully because the facts of the instant case do not admit of easy classification. There is authority for the proposition that the confidential information to be protected through an action for breach of a confidential relationship need not rise to the level of a trade secret. Restatement of Torts, § 757, Comment b; Sandlin v. Johnson, 152 F.2d 8, 11 (8th Cir. 1945); National Rejectors, Inc. v. Trieman, supra. Therefore this Court has based its decision on its conclusions that much of the technical information conveyed by plaintiff cannot be regarded as trade secrets, and, that plaintiffs are not likely to succeed in showing, under the stringent standards of Carboline Co. v. Jarboe, supra, that defendant's Vapor Condenser incorporates any trade secrets or other confidential information from plaintiff.
Turning to the items of information which plaintiff has provided defendant in this case, we note that many of them were items which, according to the testimony of plaintiff's expert witness, Dr. Swanson, on cross-examination, could be obtained by examination and measurement of the Resolver itself: the size and shape of the coils, the temperature of the stone bed, the air flow through the machine, the disposition of the solvent recovery tank and separator, information about the compressor unit, and the temperature of the incoming and outgoing air. In addition, the following items were disclosed in the plaintiff's United States patent: alternative systems of air flows, the coil temperature of -20° C which was required for the condensation of "perc", the by-passing of the steam coil by the return air path, information about the finned coil approach, and certain principles of the deodorizing cycle.
Dr. Swanson also testified on cross-examination that certain of the other items of information related to the dry cleaning equipment with which a Resolver was combined. These included the expected solvent recovery rates, and heat control in the dry cleaning tumbler. The method for determining the optimum drying time before beginning deodorization is discussed in the operating manual which accompanies the Resolvers.
With regard to the above items, the Court finds that since they were embodied in the Resolver itself, or contained in the patent or operating manual, the plaintiff has not established their status as trade secrets. The fact that plaintiff may have engaged in lengthy experimentation and research to produce the final product is not sufficient to shield the information with such status. Nor is the fact that some effort would be necessary to uncover the information determinative. The dimensions of the component parts, which were held not to be trade secrets in National Rejectors, Inc. v. Trieman, supra, were obtainable from the finished product only with some effort by one skilled in measurement.
Of the items of information remaining to be discussed, several relate to features which are not employed in defendant's Vapor Condenser. These include information about the stone bed, eutectic plates, and reversed air flow. The odor threshold of the solvent "perc", another item transmitted, is something that can be discovered by rather unsophisticated experimentation. The remaining items were the English cost data, wiring diagrams, and the design rate of cycling the compressor. In view of the fact that the component units of the Vapor Condenser differ from those of the Resolver, it is not apparent that this information could have been useful to defendant. At least we think that the plaintiff has not established the likelihood that it *172 will prevail at trial in showing that this information, or any other confidential information, was actually employed by defendant in designing the Vapor Condenser. For the same reason we find the line of cases typified by Smith v. Dravo, 203 F.2d 369 (7th Cir. 1953) to be inapposite.
It appears that plaintiff in the instant case may be relying on the kind of evidence which the Missouri Supreme Court has labelled "circumstantial". Carboline Co. v. Jarboe, supra. Such proof includes the facts that defendant had access to the confidential information, that defendant developed its products much more quickly than did plaintiff, and the fact of functional equivalence in products. The Court in Carboline took note of the fact that defendant had independent scientific skill in its labor force, and the same feature is present in the instant case. It is not sufficient for the plaintiff to show that information was given to defendant; its incorporation into the final product must also be shown.
In Metal Lubricants Co. v. Engineered Lubricants Co., 284 F.Supp. 483, 159 U.S.P.Q. 261 (E.D.Mo.1968), aff'd, 411 F.2d 426 (8th Cir. 1969), plaintiff oil manufacturer sought an injunction against a group of former employees who had allegedly taken customer lists and product specifications and formulas with them to form a new company. The court found that the defendants had had access to information about the working properties of the plaintiff's products, and when a customer inquired about a product's ingredients, defendants had had access to that information as well. One of the defendants testified, however, that they had developed their products by subjecting competitors' oils to laboratory analysis. The court denied injunctive relief:
The strict standards of Missouri law in the area of trade secrets compel the conclusion that plaintiff has failed to show any substantial misappropriation of protected information. The court is guided in this matter by the recent and very thorough opinion of the Missouri Supreme Court in National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 152 USPQ 120.
* * * * * *
Defendants were denied access to the more valuable product information. There was considerable evidence, supported by expert testimony on behalf of defendants, that even this information could often be obtained by proper meansthrough laboratory analysis, if not general gleanings from the trade. The court thus concludes that what little product information defendants were given in confidence cannot be held to be subject to protection as trade secrets. 284 F.Supp. at 487-88.
We find that Neil and Spencer has similarly failed to show any substantial misuse of protected information.
For the above reasons, the Court finds that a temporary injunction is not warranted on Counts I or III. We do not discern any greater likelihood of plaintiff's success on the merits of Counts II or IV, nor do we find that the plaintiff has established a greater susceptibility to irreparable injury or a greater degree of hardship under the theories of those counts. Therefore, the plaintiff's prayer for preliminary injunctive relief will be denied.